SCOTT N. SCHOOLS (SC 9990)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

TRACIE L. BROWN (CABN 184339)
JONATHAN D. SCHMIDT (CABN 230646)
Assistant United States Attorneys
    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436–6767
JOHN GIBBS (VABN 40380)
JOANNA BALTES (CABN 205061)
DOJ Trial Attorneys
    950 Pennsylvania Avenue, Suite 2714
    Washington, D.C. 20350
    Telephone: (202) 353-3469
               (202) 307-6326

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 07CR 00501-01-JF (HRL) |
|     Plaintiff, | |
|     v. | **GOVERNMENT'S APPEAL OF MAGISTRATE'S PRE-TRIAL RELEASE ORDER FOR DEFENDANT RAHMAT ABDHIR** |
| RAHMAT ABDHIR, | |
|     a/k/a Sean Kasem, | |
|     a/k/a Sean Kalimin, | |
|     a/k/a Roy Kalimin, | |
|     a/k/a Salam A. Jabar, and | |
| ZULKIFLI ABDHIR, | |
|     a/k/a Zulkifli Bin Abdul Hir, | SAN JOSE VENUE |
|     a/k/a Hulagu, | |
|     a/k/a Holagu, | |
|     a/k/a Lagu, | |
|     a/k/a Marwan, | |
|     a/k/a Kulon | |
|     a/k/a Musa Abdul, | |
|     a/k/a Musa Abdul Hir, | |
|     a/k/a Zulkifli Abdul Hir, | |
|     a/k/a Zulkifli bin Hir, | |
|     a/k/a Abdul Hir bin Zulkifli, | |
|     a/k/a Abdulhir Bin Hir, | |
|     a/k/a Bin Abdul Hir Zulkifli, | |
|     Defendants. | |

# I.

# INTRODUCTION

Plaintiff United States of America, by and through its counsel of record, hereby files this appeal of Magistrate Judge Howard R. Lloyd's order granting pre-trial release to defendant Rahmat Abdhir ("defendant" or "Abdhir").  Defendant is charged in an indictment with conspiracy to provide material support to terrorists, providing material support to terrorists, contributing goods and services to a specially designated global terrorist and false statements.

As a matter of law, defendant is presumed to be both a danger to other persons and the community and a flight risk, and has failed to present any facts which rebut those presumptions.  Defendant must therefore be detained pending trial.  Even if defendant can rebut the presumptions of danger and flight, the government has nonetheless demonstrated by clear and convincing evidence that defendant is a danger to the community and by a preponderance of the evidence that defendant is a flight risk.  As more fully explained below, defendant should be detained pending trial because:

- defendant has been charged with a Federal Crime of Terrorism in which it is alleged that he provided material support and resources to his brother, Zulkifli Abdhir, a wanted terrorist in the Philippines by providing him with money to purchase firearms and ammunition, and by providing him with two-way radios to be used to make Improvised Explosive Devices (IED's);
- defendant was interviewed by the FBI following his arrest on August 2, 2007, and at that time he admitted that he knew that the two-way radios he was supplying for his brother would be used to make bombs;
- Zulkifli Abdhir emailed defendant newspaper articles which reported bombings in Central Mindanao;
- a search of defendant's residence and a storage facility resulted in the seizure of five rifles, one handgun, three sniper scopes, five assault rifle magazines, nearly 1,000 rounds of ammunition, and dis-assembled firearms components;

///

1 • graphic photos of the defendant in a face mask and sunglasses posing with approximately five assault rifles, including one with a small child sitting with the assault rifles;
• three knives with 12" blades;
• various military manuals on AK-47 rifles, improvised munitions, unconventional warfare devices and techniques on incendiaries, sniper training, tactics, technicals and concepts of anti-armour warfare, guerilla warfare, special forces operations;
• defendant has substantial ties in Southeast Asia, including virtually his entire immediate family with the exception of his Vietnamese wife and four small children;
• defendant owns property in Malaysia;
• defendant is facing charges that could potentially result in up to 298 years in prison; and,
• a $600,000 secured bond is not sufficient to secure defendant's appearance and adequately safeguard other persons and the community where the defendant has been actively supporting a Designated Global Terrorist;
• a number of the properties that have been posted are not primary residences;
• the defendant's own property has been posted though it is subject to criminal forfeiture and the Government is likely to move for forfeiture of that property in the future.

Since the law presumes that defendant is both a danger to other persons and the community and a flight risk based on the instant charges, he must therefore be detained pending trial.

///
///
///
///
///

3

## II.

## FACTS AND PROCEDURAL HISTORY

### A. The Indictment of the Defendant and Zulkifli Abdhir

#### 1. Material Support to Terrorists

On August 1, 2007, the Grand Jury sitting in San Jose, California returned a sixteen count indictment against the defendant and his brother, Zulkifli Abdhir. Zulkifli is a Specially Designated Global Terrorist wanted by the United States Government as well as the governments of Malaysia and the Philippines. It has been illegal since 2003 to contribute any goods or services to Zulkifli Abdhir.

The indictment in this case charges the defendant, Rahmat Abdhir with Conspiracy to Provide Material Support to Terrorists and Providing Material Support to Terrorists in violation of 18 U.S.C. § 2339A which carry maximum penalties of fifteen years in prison for each count, thirteen counts of Contributing goods and services to a Specially Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) which carry maximum penalties of twenty years in prison for each count, and one count of False Statements in violation of 18 U.S.C. § 1001 which carries a maximum penalty of up to eight years in prison. Much of the evidence set forth in the indictment consists of e-mails between Zulkifli Abdhir and the defendant, where Zulkifli Abdhir requests money to buy guns and ammunition and two-way radios to be used to manufacture IED's.

#### 2. The Interview of the Defendant

The FBI interviewed the defendant at the San Jose Field Office on August 2, 2007. Initially the defendant denied that he was supplying his brother, Zulkifli Abdhir, with any items that could potentially be lethal. He claimed that much of the money that he sent overseas was sent to a charity, about which he had very little information.

However after these initial denials, the defendant was shown some of the evidence in this case. At that time he changed his story and he admitted that he had been supplying his brother with money and material, and he knew that it was going to Zulkifli Abdhir, and he knew that his brother was a wanted terrorist. He also admitted that he regularly corresponded with his brother by e-mail about items that Zulkifli Abdhir wanted in the Philippines. Of particular note, he told

the agents that he knew that some of the two-way radios that he sent to his brother in the Philippines were intended for use in improvised explosive devices (IED's).

**3.    The Search Warrants**

On August 2, 2007, search warrants were executed at the defendant's home in Sunnyvale, California, a commercial storage facility rented by him, and his place of employment. A number of items which are relevant to the issue of detention were recovered during the search warrants. In the bedroom of the defendant's house, the following items, among others, were recovered:

> 1) Miscellaneous firearms including a sniper scope and dis-assembled gun butts and gun stocks.
> 2) Miscellaneous ammunition for different types of firearms.
> 3) Three knives.
> 4) Uniden two-way radios.
> 5) Graphic photos of the defendant in a face mask and sunglasses posing with approximately five assault rifles, including one with a small child sitting with the assault rifles;

In a shed adjacent to the defendant's house, the following items, among others, were recovered:

> 1)  Two sniper scopes.
> 2)   Five assault rifle magazines.
> 3)  40 rounds of AK-47 ammunition.
> 4) 500 rounds of .223 ammunition.
> 5) 400 rounds of .22 ammunition.
> 6) A military manual,  "Guerilla Warfare and Special Forces Operations."
> 7) A military manual on AK-47 rifles.
> 8) A military manual,  "Mine and Countermine Operations."
> 9) An "Improvised Munitions Handbook."
> 10) A military manual, "Unconventional Warfare Devices and Techniques Incendiaries."

        11) A military manual on sniper training.

        12) A military manual dealing with the tactics and techniques of anti-armor warfare.

In a commercial storage facility rented by the defendant, the following items, among others, were recovered:

        1) Five rifles.

        2) One handgun.

        3) A document indicating that the defendant was the owner of a Ruger .9 mm handgun, however that particular weapon has not been found.

**B.**    **Defendant's Detention Hearing and Order of Pre-trial Release**

On August 7, 2007, defendant appeared before Judge Lloyd for a detention hearing. The government moved for detention based on risk of flight and that defendant was a danger to other persons and the community, arguing the presumption under 18 U.S.C. §3142(f)(1). After hearing from both parties, Judge Lloyd ordered that defendant be held as a flight risk, but he informed the defense that they could re-visit the issue if they could assemble an acceptable bond package. Judge Lloyd did not find that the defendant was a danger, under the theory that while the defendant might be a danger to individuals in the Philippines, he did not appear to be a danger to anyone in the San Jose area.

On August 14, 2007, defendant appeared before Judge Lloyd for a second hearing. The defendant offered three individuals to act as sureties for him, and he also offered to post his own house as part of the bond package. The total value of the bond package was approximately $600,000. At this second hearing, the government objected to the bond and again moved for detention based danger to other persons and the community and risk of flight. However Judge Lloyd agreed to release the defendant. On August 17, 2007 the government moved to stay the release order.

///

///

///

## III.

**DEFENDANT IS A DANGER TO THE COMMUNITY AND A FLIGHT RISK AND SHOULD BE DETAINED PENDING TRIAL**

**A.    Legal Standard**

Title 18, United States Code, Section 3145(a)(1) provides in pertinent part that:

> If a person is ordered released by a magistrate judge, . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

18 U.S.C. § 3145(a)(1). "[A] district court's review of a magistrate's detention order is to be conducted without deference to the magistrate's factual findings." *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990). . Thus, this Court must make its own independent determination regarding defendant's detention status. This Court reviews the magistrate judge's decision de novo. *Id.* at 1191.

**B.    As a Matter of Law, Defendant is Presumed a Danger and a Flight Risk**

The Bail Reform Act of 1984 ("the Act") permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). A finding that a defendant is a danger to any other person and the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406.

In cases involving a Federal Crime of Terrorism carrying in excess of ten years in prison,[1] the Act establishes a rebuttable presumption that a defendant is both a flight risk and a danger to other persons and to the community. 18 U.S.C. § 3142(e). That presumption exists if

---

[1] Conspiracy to provide and providing material support to terrorists under 18 U.S.C. § 2339A constitute Federal Crimes of Terrorism. *See* 18 U.S.C. § 2332b(g)(5)(B). It carries a maximum penalty of fifteen years in prison.

there is "probable cause" that the defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in section 2332b(g)(5)(B) of title 18, United States Code. 18 U.S.C. § 3142(e). A grand jury indictment, as returned in this case, establishes "probable cause" under 18 U.S.C. § 3142(e) and gives rise to the Act's presumptions. *United States v. Vargas*, 804 F.2d 157 (lst Cir. 1986); *United States v. Suppa*, 799 F.2d 115 (3d Cir. 1986); *United States v. Contreras*, 776 F.2d 51 (2d Cir. 1985). Once the presumption is triggered, the defendant has the burden of producing or proffering evidence to rebut the presumption. *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989); *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988).

If the defendant proffers evidence to rebut the presumption, the Ninth Circuit has identified several relevant statutory factors in determining whether pretrial detention is appropriate: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755 (9th Cir. 1986); *Motamedi*, 767 F.2d at 1407.

Congress intended that the statutory presumptions would have a practical effect, and the presumptions do not disappear when a defendant meets his or her burden of producing rebuttal evidence. *United States v. Perez-Franco*, 839 F.2d 867, 870 (1st Cir. 1986); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). The presumptions remain in the case as evidentiary findings militating against release, to be weighed along with other evidence relevant to the factors listed in Section 3142(g). *Dominguez*, 783 F.2d at 707. Indeed, the Act's presumption should be added as a significant factor that supports pretrial detention under both rationales for detention. *See Perez-Franco*, 839 F.2d at 870 (presumption a factor militating against release); *United States v. Cook*, 880 F.2d 1158, 1160 (10th Cir. 1989)(same).

///

///

### C. Defendant Has Not Rebutted the Presumption that He Is a Danger to Other Persons and the Community and a Flight Risk

Defendant has presented no facts which are sufficient to rebut the legal presumption that he is a danger and a flight risk. At the first detention hearing, defense counsel argued that defendant's strong Islamic faith and family loyalty prompted his support of his brother and that he only sent items that were for the family's welfare and was careful not to send items that were illegal. However, the indictment clearly reflects that other items were sent, defendant acknowledged that in his post-arrest interview, and the defendant attempted to conceal his shipments to his brother by using phony names and addresses. The only additional facts presented by defendant thus far is a bond signed by three people who have agreed to post property on his behalf. The defendant also posted his own house in Sunnyvale, California as part of the bond package.

The fact that the defendant has posted his own house as part of the bond package should be particularly unpersuasive to the Court. As the government noted at the first detention hearing on August 7, 2007, defendant's house is subject to criminal forfeiture, and it is likely that the government will move for forfeiture of the house at a later date. Further, the equity in defendant's house is $113,000, a modest amount when faced with the prospect of spending decades in prison.

As for the other three sureties, the fact that they have posted property on his behalf fails to rebut the presumptions of danger and flight. Although the total bond set is $600,000, no one individual surety is responsible for more than $313,000. Of the four properties that were presented for bond, only one property represents the primary residence of a surety. The other properties are rental properties or the primary residence of defendant. Although defendant's wife is a surety, she is not listed on the title documents to defendant's home. Further, defendant himself owns property in Malaysia and most of defendant's family lives overseas. The amount of property posted by individual sureties in this case is not enough to ensure his appearance. The fact that three of the four sureties are not willing to post their primary residences is telling and indicates a lack of faith on their behalf that defendant will indeed abide by the conditions of release.

Nothing about defendant's bond would prevent him from fleeing this country to try to evade these serious criminal charges, or to continue to provide material support to a wanted terrorist in the Philippines. If the defendant was willing to provide material support to a notorious, wanted terrorist overseas for a period of years, armed with the knowledge that his support would be used to kill people and destroy property overseas, it is difficult to imagine that the fact that three people have posted property on his behalf would prevent him from fleeing or continuing to pose a danger to others. The statutory factors contained in 18 U.S.C. § 3142(g) clearly establish that this defendant is a danger and a flight risk and should be detained pending trial.

**D.**     **Statutory Factors Requiring Detention**

    **1.**     **Nature and Circumstances of the Offense Charged (18 U.S.C. § 3142(g)(1))**

This factor weighs heavily in favor of detention. The grand jury has indicted defendant for Conspiracy to Provide Material Support to Terrorists, Providing Material Support to Terrorists, Contributing goods and services to a Specially Designated Global Terrorist and False Statements. Defendant has admitted to providing material to his co-defendant in the Philippines. He has even admitted to knowing that the two-way radios that he was supplying to his brother were to be used to make bombs. Further, the evidence indicates that Zulkifli Abdhir kept defendant informed of bombings in the Philippines. These offenses potentially carry up to 298 years in prison. The serious nature of the charges show that defendant is a danger to the community. Additionally, defendant has every incentive to flee and he has substantial ties overseas.

    **2.**     **Weight of the Evidence Against Defendant (18 U.S.C. § 3142(g)(2))**

The evidence against defendant is extremely strong. The indictment in this case offers a glimpse of some of the evidence that will be used against the defendant. Much of that evidence consists of e-mails between the defendant and his brother Zulkifli Abdhir. In an interview with the FBI on August 2, 2007, the defendant initially tried to deny that he had any contact with his brother, but when confronted with the evidence, he admitted that he did, in fact, correspond with his brother.

In the course of those communications the defendant willingly agreed to get Zulkifli Abdhir $3,000 to help him purchase a particular firearm, an M203. (Indictment, Overt Acts 15-21). He received an e-mail from his brother Zulkifli which describes a person who goes by the name of "Bangla" who gives away prizes which appears to be a veiled reference to bombings. Zulkifli also tells him to read the newspaper the day after tomorrow to see about the prizes. (Indictment, Overt Act 33). Ten days later the defendant sent his brother a news story that described how an individual named Abdulbasit Usman was the principal suspect in last week's bombings in Central Mindanao. (Indictment, Overt Act 36). In November 2006, Rahmat Abdhir and Zulkifli Abdhir correspond about the fact that Bangla and Hulagu (an alias for Zulkifli Abdhir according to what Rahmat Abdhir told the FBI) are both wanted fugitives who are on the run. (Indictment, Overt Acts 46 - 47). On July 3, 2007, less than a month before his arrest, Rahmat Abdhir received an e-mail from his brother reporting that he had recently taught a course on sniping and he had taught his students how to zero in on their targets. In reply Rahmat Abdhir agrees to continue to get material for his brother, in this case a pouch for an M16 magazine. (Indictment, Overt Acts 76 - 77)

The defendant demonstrates his knowledge that his brother is a wanted fugitive by sending him news articles reporting as much. In July 2006, Rahmat Abdhir sent an e-mail to his brother which reported that Zulkifli Abdhir was among a group of high-level Jemaah-Islamiyah[2] (JI) operatives who have been given sanctuary by the Moro Islamic Liberation Front (MILF) and have continued to train members of JI and the Abu Sayyaf Group[3] in MILF camps. (Indictment, Overt Act 5). In August 2006, the defendant sent an e-mail to Zulkifli Abdhir with an article from the Jakarta Post which reported that his brother was the subject of an August 10, 2006 raid by the Philippines military which resulted in a 30-minute gun battle with MILF fighters. (Indictment, Overt Act 13). A few days prior to that e-mail, Zulkifli Abdhir had told his brother about this same event, and he reported that two soldiers were killed in the fighting.

---

[2] Jemaah-Islamiyah has been designated a Foreign Terrorist Organization by the United States Government since 2002.

[3] The Abu Sayyaf Group has been designated as a Foreign Terrorist Organization by the United States Government since 1997.

11

(Indictment, Overt Act 9). In January 2007, Rahmat Abdhir sent an e-mail to Zulkifli Abdhir which contained a link showing a photograph of a Philippine military official standing in front of a large rewards for justice poster which pictured several wanted individuals including Zulkifli Abdhir. (Indictment, Overt Act 54).   Two months later in March 2007 Rahmat Abdhir provided Zulkifli Abdhir with a news article reporting that the United States government had just offered a $5 million reward for information leading to the capture of Zulkifli Abdhir. (Indictment, Overt Acts 69).

In short, the indictment contains a revealing glimpse into a relationship in which Zulkifli Abdhir reports to his brother Rahmat Abdhir, on the violence that he is a part of in the Philippines.  The defendant, rather than shying away from this conduct, willingly agrees to provide his brother with money and material to further his violent aims.  The indictment is replete with references to money for guns, ammunition and two-way radios to be used to manufacture IED's.  Further, the indictment reveals that Zulkifli Abdhir kept defendant informed of the violent acts occurring in the Philippines, including bombings using IED's.

Although the contents of the indictment are simply allegations at this point, the defendant admitted to the FBI that he was supplying these items to a wanted fugitive and further acknowledged that he was sending two-way radios that would be used to construct improvised explosive devices..

In short, the substantial weight of the evidence against this defendant shows him to be both a danger to others and a flight risk.

### 3. **Defendant's History and Characteristics (18 U.S.C. § 3142(g)(3)(A))**

This factor requires an analysis of the defendant's family ties and community ties, among other things.   The defendant was born in Malaysia, he maintains a Malaysian passport, and all ten of his siblings and his mother live overseas, primarily in Malaysia.  Two of those siblings, Zulkifli Abdhir and Hidayat Abdhir,  lived in the United States and attended college here before moving back overseas.  The government's concern is that the defendant is now facing many years in prison, so he too may choose to sever his ties to the United States and move overseas with the rest of his family. In addition, while the defendant is a naturalized United States citizen,

and his four young children are United States citizens by virtue of being born in this country, he has obtained Malaysian citizenship for two of his children, and has attempted to obtain Malaysian citizenship for a third. The evidence also indicates that defendant owns property in Malaysia.

This clearly suggests an intent and a motivation to return to Malaysia at some point. Now that the defendant is facing many decades in prison, and now that he is aware that his bank accounts have been seized and his house is subject to criminal forfeiture, he has every incentive to flee, and virtually no incentive to remain in the United States to face the very strong case against him.

In contrast, the defendant's only immediate family in the United States is his Vietnamese wife and his four young children. As discussed *supra*, defendant's wife does not own any property in the United States. The fact that his wife is from South-East Asia, and given that so many of his ties are to that region, it is even more likely that he would be inclined to flee the United States. At this point there is nothing to keep the defendant here, and every incentive for him to want to leave.

At the hearing on August 7, 2007, the issue of the defendant's house in Malaysia came up. The government maintained that this house is owned by the defendant, while the defense contended that it belonged to his deceased father. In either regard, the significance of this house is that, unlike many defendants, this defendant has a specific place available to live if he is able to flee the United States. He is also aware that his brother, Zulkifli Abdhir, has been able remain a fugitive for a long period without being captured. This fact may also embolden the defendant to attempt to flee.

Based on this defendant's substantial ties overseas, his limited community ties in the United States, and his high criminal exposure, he is a serious risk of flight in this case. As defendant has never served time in jail, the prospect of many years in jail constitutes a strong incentive to flee from prosecution. For all those reasons, he should be detained pending trial.

///

///

13

**4.     Defendant Poses a Serious Danger to Other Persons and the Community if Released**

At the two detention hearings on August 7 and August 14, 2007, the magistrate judge asked about the community that the defendant was a danger to. Specifically, whether he represented a danger to the community in San Jose, or to the community in the Philippines. While the government contends that he represents a danger to both, this is a distinction that is not critical for purposes of detention. As the Bail Reform Act explicitly states, the Court must hold a hearing to "determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of **any other person** and the community." 18 U.S.C. § 3142(f)(Emphasis added). In fact, throughout the Bail Reform Act, the "any other person" language is used when the issue of dangerousness is discussed.

Clearly Congress intended that the dangerousness analysis should encompass a broader community than the very narrow ones that defendants are released back into. This is not surprising. It is difficult to believe that Congress would want defendants to be released on bail because they may not pose a harm to their local community, even if they pose a potential lethal harm to a community across the country or overseas.

In *United States v. Salerno,* 481 U.S. 739 (1987) the Supreme Court held that the Bail Reform Act authorizes pretrial detention on the basis of future dangerousness which is a permissible regulation that does not run afoul of substantive due process. *Salerno* at 748. In that case the defendants were leaders of the Genovese Crime Family. Significantly, the danger that was presented by their release was the danger that they would continue to engage in business as usual, in this case, the business of threats, beatings, and murder. *Id.* at 744. Clearly the actions of a Mafia crime family of this sort cannot be neatly limited to the immediate community where they live.

Similarly, in *United States v. O'Roarke*, 2006 U.S. Dist. LEXIS 1044, January 12, 2006, (D. Ariz.), the Court found that the Defendant who was charged with possession of child pornography, was a danger to the community because of the abundance of pornographic images which the Defendant retained and made available for distribution. This case certainly stands for

the proposition that the "community" can include the online community, which is markedly different from the immediate community that a defendant is released into pending trial.

With regards to the safety of any other person, especially persons in the Philippines, this is a defendant who still represents a threat to the safety of the people there. He is the brother of a wanted fugitive in the Philippines who has been involved in deadly violence in that region. He has been assisting his brother in these endeavors over a period of years. This assistance includes providing him with money for firearms, ammunition, and even attempting to provide two Colt .45 magazines. It includes providing two-way radios knowing that they are intended to be used in IED's. The defendant has acknowledged that he was aware that the two-way radios he was supplying to his brother would be used to construct improvised explosive devices. Further, defendant was aware of the deadly nature of the IED's, because his brother kept him informed of the bombings that were occurring in the Philippines. The defense has proffered no information to suggest that this defendant is no longer a danger to the community in the Philippines.

With regards to the safety of the community, especially the community in the San Jose area, this is a defendant who still represents a threat to the safety of the people here. He has a strong affinity for guns, especially AK-47 style rifles. As mentioned previously, during the search of defendant's residence, photos were recovered which depicted the defendant, wearing a face mask, posing with numerous assault rifles. Even more alarming were photos of the defendant posing with the assault rifles and a young child.

Defendant has stockpiled nearly 1,000 rounds of ammunition and manuals dealing with everything from guerilla warfare, AK-47's, sniper training and improvised munitions. At least one firearm registered to this defendant has not been recovered. He has now been arrested for his criminal conduct. He is aware that he is facing a lengthy jail sentence. The situation for this defendant has changed dramatically in the past several weeks, and given the violent nature of the crimes with which he is charged and his demonstrated access to assault rifles and ammunition, it appears to be a very risky strategy to return him to the community.

///

///

## IV.

## CONCLUSION

Defendant chose to provide thousands of dollars to his brother in the Philippines, even though he knew Zulkifli Abdhir he was a wanted terrorist who was engaged in bombings and other violent activities. The defendant chose to provide material support to his brother using false names and phony addresses. The defendant told the FBI that he knew that the two-way radios he was sending overseas were really being used to make bombs. Given the facts of this case, it is difficult to envision any condition or combination of conditions that could possibly protect the safety of other persons and the community, or assure the defendant's presence at trial. For these reasons, the government respectfully requests that this Court find that defendant has failed to rebut the statutory presumptions that he is a danger to other persons and the community and a flight risk and order him detained pending trial. Alternatively, the government asks that this Court find that the government has established by clear and convincing evidence that defendant is a danger to other persons and the community and by a preponderance of the evidence that he poses a flight risk and that there are no conditions or combination of conditions that will reasonably assure the safety of the community and his appearance in court.

Dated:        August 21, 2007                    Respectfully submitted,


SCOTT N. SCHOOLS
United States Attorney


/s/ John Gibbs
/s/ Joanna Baltes
JONATHON SCHMIDT
TRACIE BROWN
Assistant U.S. Attorneys
JOHN GIBBS
JOANNA BALTES
DOJ Trial Attorneys

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>      Plaintiff,<br>      v.<br>RAHMAT ABDHIR,<br>      a/k/a Sean Kasem,<br>      a/k/a Sean Kalimin,<br>      a/k/a Roy Kalimin,<br>      a/k/a Salam A. Jabar, and<br>ZULKIFLI ABDHIR,<br>      a/k/a Zulkifli Bin Abdul Hir,<br>      a/k/a Hulagu,<br>      a/k/a Holagu,<br>      a/k/a Lagu,<br>      a/k/a Marwan,<br>      a/k/a Kulon<br>      a/k/a Musa Abdul,<br>      a/k/a Musa Abdul Hir,<br>      a/k/a Zulkifli Abdul Hir,<br>      a/k/a Zulkifli bin Hir,<br>      a/k/a Abdul Hir bin Zulkifli,<br>      a/k/a Abdulhir Bin Hir,<br>      a/k/a Bin Abdul Hir Zulkifli,<br>      Defendants. | No. 07CR 00501-01-JF<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

    I, Joanna P. Baltes, am a citizen of the United States and I am at least eighteen years of age. My business address is 950 Pennsylvania Avenue, N.W., Suite 2714, Washington, D.C. 20350.

    I am not a party to the above-entitled action. I have caused service of the government's **APPEAL OF MAGISTRATE'S PRE-TRIAL RELEASE ORDER FOR DEFENDANT RAHMAT ABDHIR** on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them:

        Nicholas Humy. nicholas_humy@fd.org

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 21, 2007.                      /s/ Joanna P. Baltes
                                                                             JOANNA P. BALTES