# EXHIBIT C
## Pgs. 1-10

## U.S. DEPARTMENT of STATE

# Malaysia

## Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

Malaysia is a federal constitutional monarchy with a population of approximately 26.6 million. It has a parliamentary system of government headed by a prime minister selected through periodic multiparty elections. The National Front, a coalition of political parties dominated by the United Malays National Organization (UMNO), has held power since 1957. The most recent national elections, in March 2004, were conducted in a generally transparent manner, but the opposition complained of the ruling coalition's exploitation of the powers of incumbency. The civilian authorities generally maintained effective control of the security forces.

The government generally respected the human rights of its citizens; however, there were problems in some areas. The government abridged citizens' right to change their government. The government maintained no independent body to investigate deaths that occurred during apprehension by police or while in police custody. Other problems included police abuse of detainees, overcrowded prisons, use of the Emergency Ordinance and other statutes to arrest and detain persons without charge or trial, and persistent questions about the impartiality and independence of the judiciary. The government continued to restrict freedom of press, association, and assembly and placed some restrictions on freedom of speech, including prohibitions of organized public discussions about "sensitive" religious topics. Violence against women remained a problem. The country was a destination and transit point for trafficking in women and girls for the purposes of prostitution and domestic servitude. Longstanding government policies gave preferences to ethnic Malays in many areas. Workers' rights were impeded by long court backlogs and limitations on the right to organize unions in some industries. Migrant workers faced some discrimination and exploitation.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

The government or its agents did not commit any politically motivated killings during the year. Local nongovernmental organizations (NGOs) reported that police killed 20 persons while apprehending them, up from nine such killings in 2005. Local NGOs also reported that 19 persons died in police custody during the year, up from eight such deaths in 2005.

The law empowers magistrates and public prosecutors to investigate deaths of persons in police custody and to charge those responsible. In April the director of the federal criminal investigation department stated that magistrates had absolved police of blame in 39 of the 96 deaths in their custody between 2000 and March. Magistrates determined those cases to be "sudden deaths" involving no police culpability. The remaining cases were in various stages of investigation. At year's end no prosecutions had been initiated as a result of the investigations, and no investigation results had been released.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

No law specifically prohibits torture; however, laws that prohibit "committing grievous hurt" encompass torture. There were no reports of torture by police. According to the government, every report of abuse of prisoners was investigated; however, the government generally did not release information on the results of internal police investigations, and whether those responsible for abuses were punished was not always known.

In July parliament passed amendments to the criminal procedure code (CPC) that banned the use of nude ear squats and codified new body search procedures designed to ensure that police conduct searches in a more dignified and standardized manner. The amendments were in response to a November 2005 incident in which police forced a detained woman suspected of harboring narcotics to strip naked, hold her ears, and squat repeatedly in front of a policewoman. Police authorities later confirmed that such squats were standard police procedure at detention facilities for females suspected of committing narcotics offenses and were

intended to expose or dislodge hidden contraband. A male policeman who surreptitiously filmed the female detainee's nude squats was dismissed from the police force.

Criminal law prescribes caning as an additional punishment to imprisonment for those convicted of some nonviolent crimes, such as narcotics possession, criminal breach of trust, and alien smuggling. The law prescribes up to six strokes of the cane for both illegal immigrants and their employers. In February the government offered approximately $2,300 (8,340 ringgit) to a legal Nepalese worker who was mistakenly detained for 51 days and caned prior to his deportation. The worker refused the settlement offer, calling the amount insufficient to compensate for his pain and suffering.

Judges routinely included caning in sentences of those convicted of such crimes as kidnapping, rape, and robbery. Some state Shari'a (Islamic) laws, which bind only Muslims, also prescribe caning (see section 1.e.). The caning, carried out with a half inch thick wooden cane, commonly causes welts and at times scarring. Males older than 50 and women are exempted from caning. Male children 10 years of age and older may be given up to 10 strokes of a "light cane" (see section 5).

Prison and Detention Center Conditions

Prison overcrowding remained a serious problem. Prison overcrowding was concentrated near major cities, with several facilities experiencing occupancy rates more than 50 percent above capacity. The Internal Security Ministry stated that five new prisons were under construction at year's end, and five additional prisons were scheduled to be completed by 2010. In September officials from Suhakam, the Human Rights Commission of Malaysia, reported that detainees under investigative detention or awaiting trial accounted for a significant portion of the prison overcrowding problem. On September 19, the government announced that it would hire additional judges, in an effort to reduce the backlog of pending court cases (see section 1.e.).

The Internal Security Ministry stated in September that 42,483 individuals were incarcerated in prisons and illegal migrant detention centers.

NGOs and international organizations involved with migrant workers and refugees made credible allegations of inadequate food and medical care, poor sanitation, and abuse by guards in the 15 government detention camps for illegal immigrants. Immigrant detainees were not medically screened prior to placement in the camps. An NGO with access to the camps claimed that overcrowding and deficient sanitation sometimes facilitated the spread of disease. During the year local NGOs were allowed into the camps with mobile medical clinics.

The government does not have an agreement with the International Committee of the Red Cross permitting prison visits. NGOs and the media generally were not permitted to monitor prison conditions. However, during the year Suhakam officials visited various prisons and immigration detention camps on an ad hoc basis.

The UN High Commissioner for Refugees (UNHCR) continued to have unlimited access to the country's immigration detention camps. During the year UNHCR staff members conducted numerous visits at various prisons and immigration detention facilities located throughout the country.

d. Arbitrary Arrest or Detention

The constitution stipulates that no person may be incarcerated unless in accordance with the law. However, the law allows investigative detention, designed to prevent a criminal suspect from fleeing or destroying evidence while police conduct an investigation. Several laws also permit preventive detention to incarcerate an individual suspected of criminal activity or to prevent a person from committing a future crime. Such laws severely restrict, and in some cases eliminate, access to timely legal representation and a fair public trial.

Role of the Police and Security Apparatus

The Royal Malaysia Police is under the command of the inspector general of police (IGP), who reports to the minister of internal security. For the past several years, the prime minister also served as the minister of internal security. The IGP is responsible for organizing and administering the police force. Police functions generally are divided into five areas: enforcement of law and order, maintenance of national peace and security, prevention and detection of crimes, arrest and prosecution of offenders, and gathering of security intelligence. The police force consisted of approximately 93,000 officers, of which 4,500 were women.

A 2005 police commission report on reform noted a rising incidence of police corruption and stated that it was endemic. Police offenses listed in the report included accepting bribes, theft, and rape; punishments included suspension, dismissal, and demotion. According to police statistics, the number of disciplinary actions against police officers had steadily declined—1,444 in 2003, 1,200 in 2004, and 886 in 2005. Warnings and fines accounted for 48 percent and 36 percent, respectively, of all disciplinary punishments of police officers during the year. In addition, a police spokesman stated that an average of 10 senior police officers and 80 to 100 lower-ranked policemen were charged with corruption each year. During the first 10 months of the year, the police dismissed 46 officers, compared with 77 dismissals during all of 2005.

As in 2005, the government continued to focus most of its police reform efforts on improving the salaries, quarters, and general living conditions of police officers. The status of other reforms recommended in the 2005 police commission report, including the formation of an Independent Police Complaints and Misconduct Commission (IPCMC), remained uncertain. On March 16, the prime minister stated that 65 percent of the commission's 125 recommendations had been implemented. On March 21, the Internal Security Ministry submitted a chart to parliament that identified whether each recommendation had been implemented but provided no subsidiary information that allowed independent observers to verify the government's claims. NGO leaders complained that the government's efforts to implement the commission's recommendations lacked transparency.

While the prime minister initially supported creation of an IPCMC, police leaders strongly resisted such a body. In late May the police Web site contained a quote from a senior police official that threatened police support for opposition candidates during the next general election if the government did not abandon forming the IPCMC. Following a strong counterresponse by National Front politicians, the IGP publicly reversed his earlier opposition and stated that neither he nor other police officers would oppose formation of the IPCMC. All anti-IPCMC commentary on the police Web site was removed, but by year's end the government had not established an IPCMC.

The police training center continued to include human rights awareness training in its courses. In March the country's 145 district police chiefs attended a mandatory three day human rights seminar. In addressing the district chiefs, the IGP urged them to respect suspects' human rights and not tolerate misbehavior by police officers under their command.

Arrest and Detention

The law permits police to arrest individuals for some offenses without a warrant and hold suspects for 24 hours without charge. A magistrate may extend this initial detention period for up to two weeks. Although police generally observed these provisions, the 2005 police commission report noted that police sometimes released suspects and then quickly rearrested them and held them in investigative custody. Police often denied detainees access to legal counsel and questioned suspects without giving them access to counsel. Police justified this practice as necessary to prevent interference in ongoing investigations, and judicial decisions generally upheld the practice. The commission stated that an "arrest first, investigate later" mentality pervaded some elements of the police force and recommended that detention procedures be reviewed to prevent abuse.

The CPC allows the detention of a person whose testimony as a material witness is necessary in a criminal case if that person is considered likely to flee. Bail is usually available for those accused of crimes not potentially punishable by life imprisonment or death. The amount and availability of bail is determined at the judge's discretion. When bail is granted, accused persons must usually surrender their passports to the court.

On July 27, parliament passed a series of amendments to the CPC that strengthened the rights of criminal suspects during their initial detention period. The amendments require an arresting officer to inform a detainee of the reason for his arrest and enable the suspect to contact his lawyer and family free of charge within 24 hours of arrest. In addition, the amendments limit investigative custody to a maximum period of seven days for crimes punishable by less than 14 years of incarceration. Judges are allowed to extend the first detention application for up to four days, followed by an additional three day period if requested by police. For crimes potentially punishable by 14 years or more in custody, a judge is allowed to grant up to seven days' detention on the first application, followed by a maximum of seven additional days based on a second application. NGO leaders praised these amendments as a significant step toward reducing historical abuses of the detention process by police.

Crowded and understaffed courts often resulted in lengthy pretrial detention, sometimes lasting several years.

On November 15, the federal Islamic Development Department (Jakim) announced revised guidelines for conducting raids on premises where Muslims are suspected of engaging in offenses such as gambling and consumption of alcohol. Although Jakim enforcement officers need not be escorted by police during their raids, the new guidelines authorize Jakim officials to enter any private premises without a warrant if they deem swift action to be necessary.

Four preventive detention laws permit the government to detain suspects without normal judicial review or filing formal charges: the Internal Security Act (ISA), the Emergency (Public Order and Prevention of Crime) Ordinance, the Dangerous Drugs (Special Preventive Measures) Act, and the Restricted Residence Act.

The ISA empowers police to arrest without warrant and hold for up to 60 days any person who acts "in a manner prejudicial to the national security or economic life of Malaysia." During the initial 60 day detention period in special detention centers, suspects are not always given access to counsel. Upon the recommendation of an advisory board, the internal security minister may authorize further detention for up to two years, with an unlimited number of two year periods to follow. Some of those released before the end of their detention period are subject to "imposed restricted conditions." These conditions limit freedom of speech, association, and travel inside and outside the country. Since 1960 more than 10,500 persons have been arrested under the ISA, of whom more than 4,100 were detained beyond the initial 60 day detention period and 2,000 were subjected to restriction orders.

Even when there are no formal charges, the ISA requires that authorities inform detainees of the accusations against them and permit them to appeal to an advisory board for review every six months. However, advisory board decisions and recommendations are not binding on the internal security minister, not made public, and often not shown to the detainee. In past years local human

rights NGOs claimed that police at times intimidated and harassed family members of ISA detainees to prevent them from taking legal action against the police.

The 1988 ISA amendments circumscribe judicial review of ISA detentions. The Bar Council has asserted that ISA detentions should be subject to full judicial review; however, the courts do not concur with this interpretation and limit their review to procedural issues. Detainees freed by judicial order nearly always were immediately detained again. Following several successful procedural challenges to ISA detentions, the Federal Court ruled that the courts should not intervene in matters of national security and public order.

In August the Abolish ISA Movement, a local NGO, stated that there were 97 persons in detention under the ISA, following the release of 11 ISA detainees during the year. The 97 detainees included 59 suspected of involvement with terrorist groups, 22 held for forging currency, and 16 held for falsification of documents or other offenses. According to Suaram, a local human rights NGO, none were formally charged with a criminal offense. Among those detained were members of the opposition Islamic Party (PAS), including Nik Adli, son of the PAS spiritual leader. In October the government paroled Adli and 16 other ISA detainees previously accused of involvement with terrorist groups. The released detainees were required to remain within a fixed area of residence and were prohibited from international travel.

Under the Emergency Ordinance, the internal security minister may issue a detention order for up to two years against a person if he deems it necessary for the protection of public order, "the suppression of violence, or the prevention of crimes involving violence." On August 26, senior representatives from the Bar Council and Suaram criticized the ordinance and said that 712 persons were being held under the ordinance at the Simpang Renggam detention facility. Council and Suaram representatives stated that the ordinance was being used to detain alleged criminals when police lacked sufficient evidence to support a traditional prosecution. For example, in June a high court judge ordered the release of 13 men held at Simpang Renggam prison for more than two years under the Emergency Ordinance for various offenses. Fearing their rearrest under the ordinance, and assisted by friends and family members, the 13 men attempted to escape as they were transported from the prison to a police station. Police immediately captured eight of the men and rearrested them under the ordinance. The other five men initially escaped but were later recaptured and incarcerated again under the ordinance. At year's end the men remained detained at Simpang Renggam prison.

Provisions of the Dangerous Drugs Act give the government specific power to detain suspected drug traffickers without trial for up to 39 days before the internal security minister must issue a detention order. Once an order is issued, the detainee is entitled to a court hearing, which may order the detainee's release. Suspects may be held without charge for successive two year intervals with periodic review by an advisory board, whose opinion is binding on the minister. However, the review process contains none of the procedural rights that a defendant would have in a court proceeding. Police frequently detained suspected narcotics traffickers under this act after the traffickers were acquitted of formal charges. According to the National Anti Drug Agency, the government detained 2,020 persons under the preventive detention provisions of the act during the first 10 months of the year, compared with 2,247 persons during the same period in 2005.

The Restricted Residence Act allows the minister of internal security to place individuals under restricted residence away from their homes. These persons may not leave the residential district assigned to them, and they must present themselves to police on a daily basis. As under the ISA, the term of detention may be renewed every two years. The minister is authorized to issue the restricted residence orders without any judicial or administrative hearings. The government continued to justify the act as a necessary tool to remove suspects from the area where undesirable activities were being conducted.

e. Denial of Fair Public Trial

Three constitutional articles provide the basis for an independent judiciary, and the government generally respected these provisions in practice. However, other constitutional provisions, legislation restricting judicial review, and additional factors limited judicial independence and strengthened executive influence over the judiciary.

The constitution provides that judicial powers be conferred by parliament rather than vested directly in the courts. It also confers certain judicial powers on the attorney general, including the authority to instruct the courts on which cases to hear, the power to choose venues, and the right to discontinue cases. The attorney general has control and direction of all criminal prosecutions under the CPC and has assumed responsibility for judicial assignments and transfers. Senior judges are appointed based on the recommendation of the prime minister.

Members of the bar, NGO representatives, and other observers expressed serious concern about the general decline of judicial independence, citing a number of high profile instances of arbitrary verdicts, selective prosecution, and preferential treatment of some litigants and lawyers. On November 21, the chief justice publicly called on the government to transfer supervision of judges operating below the high court level to the judiciary, citing the potential for government interference if they remain as civil servants. The Bar Council immediately endorsed the chief justice's comments. At year's end the government had not responded to the chief justice's recommendation.

Minor civil suits and criminal cases are heard by sessions courts. High courts have original jurisdiction over all criminal cases involving serious crimes. Juvenile courts try offenders below age 18. The special court tries cases involving the king and the sultans. The court of appeal has appellate jurisdiction over high court and sessions court decisions. The Federal Court, the

country's highest court, reviews court of appeal decisions.

Indigenous peoples in the states of Sarawak and Sabah have a system of customary law to resolve matters such as land disputes between tribes. Additionally, penghulu (village head) courts may adjudicate minor civil matters, but these were rarely used.

The armed forces have a separate system of courts.

Trial Procedures

The secular legal system is based on English common law. The constitution states that all persons are equal before the law and entitled to equal protection of the law. Trials are public, although judges may order restrictions on press coverage. Juries are not used. Defendants have the right to counsel at public expense if requested by an accused individual facing serious criminal charges. Strict rules of evidence apply in court. Defendants may make statements for the record to an investigative agency prior to trial. Limited pretrial discovery in criminal cases impeded defendants' ability to defend themselves. Defendants are presumed innocent and may appeal court decisions to higher courts. The 1964 Judiciary Court Act limits a defendant's right to appeal in some circumstances. The government stated that the limits expedite the hearing of cases in the upper courts, but the Bar Council declared that the act imposes excessive restrictions on appeals.

The Essential (Security Cases) Regulations restrict the right to a fair trial by lowering the standard for accepting self incriminating statements by defendants as evidence in firearm and certain national security cases. The regulations also allow authorities to hold the accused for an unspecified time before making formal charges.

Even when the Essential Regulations were not invoked, police sometimes used other tactics to limit the legal protections of defendants. For example, during a trial police summoned and interrogated witnesses who had previously given testimony that was not helpful to the prosecution. Police also used raids and document seizures to harass defendants, but there were no reports that police used such tactics during the year.

Contempt of court charges also restricted the ability of defendants and their attorneys to defend themselves; however, the use of such charges appeared to be decreasing.

In July the attorney general's directive regarding confessions became law after parliament passed a CPC amendment regarding police obtained confessions (see section 1.d.). In August 2005 the attorney general issued a directive that banned the use of such confessions in the prosecution of criminal cases unless the public prosecutor explicitly allowed the confession. The attorney general claimed that it would significantly reduce accusations of police abuse in obtaining confessions as well as force the police to become more proactive and thorough in criminal investigations. A deputy public prosecutor stated that the directive would enable speedier trials, since judges would no longer need to rule on the admissibility of confessions. Both Suhakam and the Bar Council publicly praised the CPC amendment. Senior police officials stated that the restrictions on confessions would place greater demands on the investigative resources of police. Several NGO leaders warned that this could result in greater use of preventive detention laws against suspected criminals.

Certain provisions of the Anticorruption Act impinge on the presumption of a public office holder's innocence, such as the requirement that accused persons prove that they acquired monetary and other assets legally. Failure to satisfy the court's demand for a satisfactory explanation can result in imprisonment of up to 20 years and a fine. In practice few such cases have been brought.

Shari'a laws are administered by state authorities through Islamic courts and bind all Muslims, most of whom are ethnic Malays. The laws and the degree of their enforcement varied from state to state. Shari'a courts do not give equal weight to the testimony of women. Many NGOs also complained that women did not receive fair treatment from Shari'a courts, especially in matters of divorce and child custody (see sections 2.c. and 5).

At year's end the attorney general's review of amendments to the Islamic Family Law Act continued (see sections 2.c. and 5). In December 2005 parliament passed the amendments to harmonize Shari'a throughout the country. The attorney general undertook the revision following protests by NGOs about several provisions.

Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

Civil Judicial Procedures and Remedies

The structure of the civil judiciary mirrors that of the criminal courts. The subordinated courts (magistrate's and sessions) have jurisdiction in criminal as well as civil matters. Many minor civil cases involving Muslims are handled in Shari'a courts pursuant to both constitutional provisions and subsequent court decisions that delineated their jurisdictional sphere of responsibility.

The high courts have general supervisory and revisionary jurisdiction over all the subordinate courts as well as jurisdiction to hear appeals from the subordinate courts in civil matters. The high courts generally hear civil cases involving claims in excess of $69,400 (250,000 ringgit), other than actions involving motor vehicle accidents and disputes between landlords and tenants. Civil cases have routinely been elevated into the court of appeal and the Federal Court.

A large case backlog often resulted in delayed provision of court ordered relief for civil plaintiffs. As of June 30, approximately 320,000 civil cases remained collectively backlogged in the sessions, magistrate's, and high courts. The chief justice of the Federal Court advocated reappointment of retired judges on an ad hoc basis to reduce the case backlog. On September 19, the government announced that it would increase the number of high court and appeals court judges from 72 to 95, and by year's end 82 judges were in place.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

Various laws prohibit such actions; however, authorities infringed on citizens' privacy rights in some cases. Provisions in the security legislation allow police to enter and search without a warrant the homes of persons suspected of threatening national security (see section 1.d.). Police also may confiscate evidence under these provisions. Police used this legal authority to search homes and offices, seize books and papers, monitor conversations, and take persons into custody without a warrant. The government monitored e mails sent to Internet blog sites and threatened detention for anyone sending content over the Internet that the government deemed to threaten public order or security (see section 2.a.).

The Anticorruption Act empowers a deputy public prosecutor to authorize the interception of any messages sent or received by a suspect through any means of communication, once a written application has been received from a senior police official involved in an official investigation. Information obtained in this way is admissible as evidence in a corruption trial.

Passed by parliament in July and scheduled to take effect on January 1, 2007, antiterrorism amendments to the penal code and CPC provide government security forces broader authority to surreptitiously install surveillance devices on private property. In addition, public prosecutors are allowed to authorize police to intercept postal and telecommunications messages if a prosecutor judges these likely to contain information regarding a terrorist offense. Intercepted communications from such efforts are admissible in court.

The law permits the Internal Security Ministry to place criminal suspects under restricted residence in a remote district away from their homes for two years (see section 1.d.).

The government bans membership in unregistered political parties and organizations (see sections 2.b. and 3).

Certain religious issues posed significant obstacles to marriage between Muslims and adherents of other religions (see section 2.c.).

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The constitution provides each citizen with "the right to freedom of speech and expression"; however, some important legal limitations exist. In practice the government restricted freedom of expression, and journalists practiced self censorship. According to the government, restrictions were imposed to protect national security, public order, and friendly relations with other countries.

The law provides that freedom of speech may be restricted by legislation "in the interest of security (or) public order." For example, the Sedition Act prohibits public comment on issues defined as sensitive, such as racial and religious matters. The Sedition Act, the Official Secrets Act, the Printing Presses and Publications Act, criminal defamation laws, and other laws were used to restrict or intimidate dissenting political speech.

The election law makes it an offense for a candidate to "promote feelings of ill will, discontent, or hostility." Violators could be disqualified from running for office.

Criminal defamation is punishable by a maximum of two years in jail, a fine, or both. The Centre for Independent Journalism, a local NGO, claimed that the threat of imprisonment and large monetary judgments for criminal defamation reinforced self censorship.

Print journalism was dominated by nine national daily newspapers—three in English, two in Malay, and four in Chinese. Parties in the ruling coalition owned or controlled a majority of shares in two of the three English and both Malay dailies. Politically well connected businessmen owned the third English language newspaper and, following a controversial private sale in October, all four major Chinese language newspapers. In October a group of 45 NGOs issued a joint press statement describing the ownership concentration of Chinese language newspapers as "detrimental to press freedom and democratic space."

Self censorship and biased reporting in the print media, while common, were not uniform; the English , Malay , and Chinese language press sometimes provided balanced reporting on sensitive issues. The mainstream press occasionally printed editorials and interviews with opposition leaders that included criticism of government policy. Observers believed this indicated the government had relaxed its interpretation and enforcement of press restrictions. However, the restrictions remained unamended and were reasserted several times during the year.

In August, following a series of controversial public forums at which constitutional guarantees of religious freedom and the legal supremacy of the constitution were discussed (see section 2.c.), the prime minister publicly called on forum organizers, news media, and Internet content providers to cease public discourse about "sensitive" religious issues. On August 21, the government's law minister stated that the government would take legal action against those who ignored the prime minister's directive. In the months following these statements and until year's end, public debate and media reporting on religious issues were significantly reduced.

The Printing Presses and Publications Act limits press freedom. Under the act, domestic and foreign publications must apply annually to the government for a permit. The act makes publication of "malicious news" a punishable offense and empowers the minister of internal security to ban or restrict publications believed to threaten public order, morality, or national security. The act also prohibits court challenges to suspension or revocation of publication permits. According to the government, these provisions ensured that "distorted news" was not disseminated to the public.

In February and March, following publication and broadcast of several caricatures of the Prophet Muhammad that were deemed highly offensive by most Muslims in the country, the government suspended publication of three daily newspapers (including permanent suspension of the Sarawak Tribune), prompted an apology from a fourth newspaper, and accepted the apologies of two of the four free to air television channels that "inadvertently" broadcast the caricatures.

In January the two chief editors of the second largest Chinese language daily newspaper, the China Press, were compelled to resign after the newspaper mistakenly identified a woman who was forced by police to do nude squats while in detention (see section 1.c.). The China Press identified the woman as a Chinese national, although she was actually an ethnic Chinese Malaysian. The deputy prime minister said the misstatement regarding her nationality had negatively impacted the perceptions of current and potential Chinese tourists. He acknowledged the government's role in the editors' forced resignations, saying it was a "reminder" to newspapers to be more responsible. The China Press published a front page apology in an apparent effort to prevent suspension of its publishing permit.

On November 7, the Internal Security Ministry suspended the weekend edition of the English language daily newspaper Malay Mail, following publication of an edition focused on teenagers and sex. The weekend edition and its editor remained suspended at year's end, pending completion of the government's investigation. The Malay Mail parent company's chief executive publicly apologized for the edition's publication.

Government power over annual license renewal and other policies created an atmosphere that inhibited independent or investigative journalism and resulted in extensive self censorship. Government officials continued to argue that the act helped to preserve harmony and promote peaceful coexistence in a multiracial country. In November 2005 the deputy internal security minister stated that during the first nine months of 2005, the Home Affairs Ministry had inspected more than one million foreign publications to assess whether their content threatened national security, public order, or morality. During that time the ministry blocked 8,812 (mostly English language) titles and confiscated more than 431,000 copies of books, newspapers, magazines, and comic books. During the year the ministry continued to review, censor, and confiscate many foreign publications.

The government continued to permit publication of haze levels whenever air quality deteriorated significantly. Until August 2005 the government had banned publication of such information.

The appeal of human rights monitor Irene Fernandez remained pending. In 2003 she was sentenced to 12 months' imprisonment for malicious publication of false material regarding abuse and torture of migrant workers at detention camps.

Publications of opposition parties, social action groups, unions, and other private groups actively covered opposition parties and frequently printed views critical of government policies. However, the government retained significant influence over these publications by requiring the annual renewal of publishing permits and limiting circulation only to organization members. Unlike in the past, the government brought no libel suits against the media during the year.

Printers, who also must have their permits renewed annually, often were reluctant to print publications that were critical of the government.

Radio and television stations were more restricted than the print media and were almost uniformly supportive of the government's news coverage and commentary. News of the opposition was tightly restricted and reported in a biased fashion. In the weeks prior to the Sarawak state assembly election on May 20, opposition parties and candidates received very little coverage--positive or otherwise--in Sarawak's mainstream media outlets, which were controlled by National Front constituent parties. Opposition party representatives claimed that one sided media coverage impeded their ability to reach voters (see section 3).

Broadcasting licenses permit only Malay language news from 8:00 to 9:00 p.m., except on a Ministry of Information channel. Internet television faced no such restrictions, and PAS continued daily Internet television broadcasts. At year's end no other material provider of Internet television content had emerged.

The government censored and banned books for profanity, nudity, sex, violence, and certain political and religious content. In June the government banned 18 books, many with religious themes (see section 2.c.). Television stations censored programming in line with government guidelines. The government banned some foreign newspapers and magazines and, infrequently, censored foreign magazines or newspapers, most often for sexual content; however, the Internet provided a means to bypass such restrictions. The government maintained a "blacklist" of local and foreign performers, politicians, and religious leaders who were not allowed to appear on television or radio broadcasts.

The government generally restricted remarks or publications that might incite racial or religious disharmony; it also attempted to restrict the content of sermons at mosques in the states controlled by the governing coalition. Some state governments banned certain Muslim clergymen from delivering sermons. The Religious Affairs Department continued to conduct background checks on all clergymen (see section 2.c.). The government also cracked down on the distribution and sale of the opposition party's video compact discs and audiocassettes. The government maintained its ban on the weekly Chinese language newspaper Epoch Times.

Internet Freedom

There were no government restrictions on access to the Internet; however, on August 1, the prime minister stated that the government would closely monitor the content of Internet Web sites and blogs that published "seditious material." At least one Internet news provider complained that the police actively monitored his Web site for "seditious" or "offensive" content.

While individuals and groups could engage in the peaceful expression of views via the Internet, including by electronic mail, Internet users were subject to the same speech restricting laws as non Internet users. Internet access was freely available, and Internet subscriptions totaled approximately 11 million at year's end; however, criminal defamation and preventive detention laws generated significant self censorship from local Internet content sources such as bloggers, Internet news providers, and NGO activists.

The Communications and Multimedia Act (CMA) requires certain Internet and other network service providers to obtain a license. In the past the government stated that it did not intend to impose controls on Internet use but noted that it would punish the "misuse" of information technology under the CMA. During the year the government did not use licensing provisions under the CMA to interfere with Internet access or to restrict Internet content.

The CMA also permits punishment of the owner of a Web site or blog for allowing content of a racial, religious, or political nature that a court deems offensive. In July 2005 police raided the home of the editor of Malaysia Today, an independent Internet news provider, and seized two computers after Malaysia Today published corruption allegations against royal family members in the state of Negeri Sembilan. No legal action was taken against the editor, but at year's end his computers had not been returned to him.

Investigations of Malaysiakini, the country's largest independent Internet news organization, continued. On July 31, police commenced an investigation of Malaysiakini, following an erroneous initial newsflash by the organization that identified police officials as possible participants in an assault on former prime minister Mahathir. That investigation continued despite a public offer of apology to police by Malaysiakini's editor in chief. A second ongoing investigation concerned Petronas' September 2005 accusation of criminal defamation.

On March 22, police seized the computers of an Internet columnist after he published reports of alleged financial wrongdoing by the chairman of Malaysian Airlines. The columnist said that the police did so to locate the information source used for his column. The case against him ceased upon the columnist's death on April 28 from natural causes.

Academic Freedom and Cultural Events

The government placed some restrictions on academic freedom, particularly the expression of unapproved political views, and enforced restrictions on teachers and students who expressed dissenting views. The government continued to require that all civil servants, university faculty, and students sign a pledge of loyalty to the king and the government. Opposition leaders and human rights activists claimed that this was intended to restrain political activity among civil servants, academics, and students.

Although faculty members sometimes were publicly critical of the government, there was clear self censorship among public university academics whose career advancement and funding depended on the government. Private institution academics practiced self censorship as well, fearing that the government might revoke the licenses of their institutions. The law also imposes limitations on student associations and on student and faculty political activity (see section 2.b.).

The government has long stated that students should be apolitical and used that assertion as a basis for denying political parties access to student forums. According to student leaders, students who signed antigovernment petitions sometimes were expelled or fined. The government enforced this policy selectively and did not refrain from spreading government views on political issues among students and teachers.

The government censored and banned films for profanity, nudity, sex, violence, and certain political and religious content. Films banned during the year included Brokeback Mountain, due to its references to homosexuality, and a locally produced film, The Last Communist, about the communist insurgency in the country from 1948 to 1960.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The constitution states that all citizens have "the right to assemble peaceably and without arms"; however, the government placed significant restrictions on this right through usage of the Public Order Ordinance and the Police Act. The ordinance restricts public assemblies that could damage security and public order, while the act requires police permits for all public assemblies except for workers on picket lines. Police define a public assembly as a gathering of five or more persons.

The decision to grant a permit rests with the district police chief; however, senior police officials and political leaders have influenced the grant or denial of some permits. Police granted permits routinely to government and ruling coalition supporters but used a more restrictive policy with government critics, opposition parties, and human rights activists.

On May 28, riot police used water cannons and batons to disperse approximately 500 demonstrators gathered in front of Kuala Lumpur's Petronas twin towers. Led by opposition members of parliament, the crowd protested the government's decisions to increase government fixed (and subsidized) prices for gasoline and electricity. Police arrested 20 protesters and reportedly beat several others as they attempted to flee the area. No one was seriously injured, but two protesters required medical treatment.

While protesting the continued detention of Aung San Suu Kyi, 68 ethnic Burmese persons were arrested in June 2005 and accused of participating in an illegal assembly. Initially, all of the detainees reportedly pleaded not guilty, claimed their right to a trial, and were remanded to prison. During the course of the proceedings, 34 of them changed their plea to guilty and were transferred from prison to an illegal migrant detention center. The other 34 were released from prison in June after the prosecution withdrew its case against them. One of the 68 protesters remained in detention at year's end.

Freedom of Association

The constitution provides for the right of association; however, the government placed significant restrictions on this right, and certain statutes limit it. Under the Societies Act, only registered organizations of seven or more persons may function as societies. The government sometimes refused to register organizations or imposed conditions when allowing a society to register. The government prohibited the Communist Party and affiliated organizations from registering and has blocked the registration of the Socialist Party of Malaysia since 1999 (see section 3). The government also has the power to revoke the registration of an existing society for violations of the act, a power that it enforced selectively against political opposition groups.

The Universities and University Colleges Act also restricts freedom of association. This act mandates university approval for student associations and prohibits student associations and faculty members from engaging in political activity. Many students, NGOs, and opposition political parties called for the repeal or amendment of the act. A number of ruling coalition organizations and politicians also supported reexamination of the act, but the government argued that the act still was necessary.

c. Freedom of Religion The constitution provides for freedom of religion; however, the government placed some restrictions on this right. Islam is the official religion, but the government significantly restricted the practice of Islamic beliefs other than Sunni Islam. Non Muslims, which included large Buddhist, Christian, Hindu, and Sikh communities, were free to practice their religious beliefs with few restrictions. The government provided financial support to an Islamic religious establishment and also provided more limited funds to non Islamic religious communities. State authorities imposed Islamic religious laws administered through Islamic courts on all ethnic Malays (and other Muslims) in some civil matters but generally did not interfere with the religious practices of the non Muslim community.

The Registrar of Societies, under the Ministry of Home Affairs, registers religious organizations. Registration enables organizations to receive government grants and other benefits. Various religious groups were not recognized as such by the government, and they sometimes registered themselves as businesses under the Companies Act to operate legally.

Prime Minister Abdullah, a proponent of Islam Hadari ("civilizational Islam"), continued to emphasize religious tolerance towards all faiths. In January non Muslim cabinet members presented a memorandum to the prime minister calling for a review of constitutional provisions affecting the legal rights of non Muslims. Following protests from several Muslim leaders within the governing coalition and a commitment by the prime minister to address the non Muslim ministers' concerns, the ministers withdrew their memorandum. The prime minister stated publicly that the constitution provided sufficient protection of religious freedom and therefore should not be reviewed or amended.

The government maintained that views held by "deviant" groups endangered national security. According to the Jakim Web site, 56 deviant teachings were identified and prohibited to Muslims as of year's end. They included Shi'a, transcendental meditation, and Baha'i teachings. The government asserted that "deviationist" teachings could cause divisions among Muslims. Jakim established

written guidelines concerning what constituted "deviationist" behavior or belief. State religious authorities, in making their determinations on these matters, generally followed the federal guidelines. Members of groups deemed "deviationist" were arrested and detained, with the consent of a Shari'a court, in order to be "rehabilitated" and returned to the "true path of Islam." The religious affairs minister stated that members of these groups were subject to prosecution, detention under the ISA, or rehabilitation. Neither the government nor religious authorities provided data on the number of persons subjected to prosecution or rehabilitation.

At year's end cases were pending against 69 of 70 followers of Ayah Pin, leader of the Sky Kingdom religious group, arrested in July 2005. One of the arrested followers agreed to undergo religious rehabilitation (see section 1.e.).

On November 14, the Selangor Islamic Affairs Department (JAIS) detained 107 persons, including several children, during a raid in Kuala Lumpur against suspected followers of the banned al Arqam Islamic group. The government banned al Arqam in 1994, and Ashaari Muhammad, the leader of its approximately 10,000 followers, subsequently spent 10 years under restricted residence. Ashaari established a holding company, Rufaqa Corporation, to manage his business interests while detained under restricted residence. At year's end Rufaqa was under investigation for allegedly supporting the revival of the al Arqam group. Four of its leaders were charged with disobeying a national fatwa (Islamic ruling) issued by Jakim against al Arqam's teachings, and they were in detention at year's end. The remaining alleged al Arqam followers were released.

The government generally respected non Muslims' right of worship; however, state governments have authority over the building of non Muslim places of worship and the allocation of land for non Muslim cemeteries. Approvals for building permits sometimes were granted very slowly. Minority religious groups reported that state governments sometimes blocked construction using restrictive zoning and construction codes.

The government demolished unregistered religious statues and places of worship. Several NGOs complained of the demolition of unregistered Hindu temples and shrines located on both private and government owned lands. The structures were often constructed on privately owned plantations prior to independence in 1957, which were later transferred to government ownership. In March state officials in Negeri Sembilan announced their intention to demolish an unregistered Hindu temple believed to be 150 years old. The temple sat on state owned land zoned for road construction in 1956 and was regularly used by approximately 300 worshippers. In May persons who used the temple sought a court injunction against the pending demolition. The court case remained open at year's end.

In July, following an 11 year dispute, a high court judge prevented a developer in Pahang State from destroying a Hindu temple on land purchased by the developer. The judge ruled that the temple existed on the land prior to the purchase and had the right to coexist on the land.

In practice Muslims are not permitted to convert to another religion. In several court rulings during the year, secular courts ceded jurisdiction to Islamic courts in matters involving conversion to or from Islam. Shari'a courts routinely denied conversion requests. In September 2005 the court of appeal denied the request of Lina Joy, a Muslim woman who had converted to Christianity, to change the religion designated on her national identity card. Joy appealed the decision to the Federal Court, and in April, citing the case as "a matter of general public interest," the Federal Court agreed to hear her appeal and address the degree to which Shari'a courts have jurisdiction over determinations of Muslim apostasy. At year's end the court had made no ruling.

The Federal Court made no decision in the appeal of a non Muslim woman involving the disposition of the remains of her Hindu spouse, who allegedly converted to Islam before his death. Despite her claim that there was no clear evidence of the conversion, Islamic religious authorities buried the man with Muslim rites. A similar case arose following the November 29 death of a Catholic man who had converted to Islam in 1990 after marrying a Muslim woman and then converted back to Catholicism in 1999. JAIS prevented the man's Catholic wife and children from claiming his body for nine days, asserting that the man remained a Muslim until his death. Following intervention by the attorney general and acting at the behest of the cabinet, Selangor State Islamic authorities withdrew their claim on the man's body; he received a Catholic funeral, and his family cremated his remains.

Article 11, an NGO named after the freedom of religion clause in the constitution, organized four public forums to discuss the perceived erosion of constitutional protection of non Muslims' religious freedom. The last three events sponsored were either canceled or shortened at the request of police, following the actual or threatened appearance of a large number of Muslim protesters. As debate over religious topics intensified, in July and August the prime minister warned both mainstream and Internet based media to refrain from publicizing debates about contentious religious issues (see section 2.a.). He also directed all NGOs – both Muslim and non-Muslim – to cease all public statements and activities that could generate further religious controversy. Article 11 held no further public discussions during the remainder of the year.

Proselytizing of Muslims by members of other religions is strictly prohibited, although proselytizing of non Muslims faced no obstacles.

On November 5, police reacted quickly and forcefully to protect worshippers at a Catholic church in Ipoh, when more than 1,000 Muslims gathered to protest the rumored baptism of several hundred Muslim children. The rumor was false, and the IGP subsequently declared that those responsible for initiating the rumor were a threat to public order and national security. The prime minister declared that the parties responsible for starting the rumor should be severely punished. On November 20, police detained a married couple from Ipoh on suspicion of starting the rumor. The couple was later released on bail, and at year's end the