# EXHIBIT C
## Pgs. 11-22

government had not decided whether to charge the couple.

According to the Malaysian Consultative Council of Buddhists, Christians, Hindus, Sikhs, and Taoists, the government restricted visas for foreign clergy under the age of 40 to inhibit "militant clergy" from entering the country. While representatives of non Muslim groups did not sit on the immigration committee that approved visa requests for clergy, the committee asked the consultative council for its recommendations. An August 2005 decision by the Selangor state religious authorities to withhold support for visa applications by foreign Muslim imams and religious teachers remained in effect at year's end. Local media reported that the decision largely targeted the ethnic Indian Muslim community, in an effort to increase the number of "homegrown" imams. Ethnic Indian religious leaders expressed concern that some mosques and religious schools might need to be closed.

Religious education according to a government approved curriculum is compulsory for Muslim children. Muslim civil servants are required to attend Islamic religious classes taught by government approved teachers.

The government discouraged but did not ban distribution in peninsular Malaysia of Malay language translations of the Bible, Christian tapes, and other printed materials. The distribution of Malay language Christian materials faced few restrictions in the eastern states of Sabah and Sarawak. In June the government banned 18 books, many with religious themes, including The Battle for God, by Karen Armstrong. Two previous books by Armstrong, A History of God and Muhammad: A Biography of the Prophet, were banned in 2005.

The government continued to monitor the activities of the Shi'a minority, and state religious authorities reserved the right to detain members of what they considered Islamic "deviant sects" under the ISA. According to the government, no individuals were detained under the ISA for religious reasons during the year.

The government generally restricted remarks or publications that might incite racial or religious disharmony. This included some statements and publications critical of particular religions, especially Islam. The government also restricted the content of sermons at mosques. In recent years both the government and the opposition Islamic party PAS have attempted to use mosques in the states they control to deliver politically oriented messages. Several states have attempted to ban opponent affiliated imams from speaking at mosques. Some states also announced measures including vigorous enforcement of existing restrictions on the content of sermons and replacement of mosque leaders and governing committees (see section 2.a.).

In family and religious matters, Muslims are subject to Shari'a. According to some women's rights activists, women were subject to discriminatory interpretations of Shari'a and inconsistent application of the law from state to state. In December 2005 parliament approved a series of amendments to the Islamic Family Law Act intended to harmonize Shari'a family law throughout the country. However, the prime minister ordered a review of amendments to the act before they were gazetted into law; the review continued at year's end (see sections 1.e. and 5).

In Kelantan State local authorities enforced wearing of headscarves by Muslim women and imposed fines for violators. In March the IGP stated that all female police officers, including non Muslims, should wear headscarves during public ceremonies. The president of the Bar Council called on the IGP to withdraw the directive, but the policy remained in effect.

During the year the PAS led state government in Kelantan reversed several previously enacted Islamic law related prohibitions. The state government allowed operation of gender segregated cinemas and concert venues, fashion shows limited to female attendees, and billiard centers for men only; however, state authorities continued to ban traditional Malay dance theaters, prohibited advertisements depicting women not fully covered by clothing, enforced wearing of headscarves by Muslim women, and imposed fines for violators. In May a case challenging Islamic penalties for theft, robbery, illicit sex, consumption of alcohol, and renunciation of Islam in Kelantan State was withdrawn from the Federal Court. In December the Kelantan state government enacted a by law against "indecent dressing" by Muslim women working in retail outlets and restaurants. The dress code requires headscarves and allows only faces and hands to be exposed. The law also stipulates that non Muslim women should avoid dressing "sexily or indecently." Women who violate the dress code can be fined up to $139 (500 ringgit). Women's rights leaders and the minister of women, family, and community development criticized the new law as overly restrictive.

The government provided no statistics regarding raids by federal religious police of nightclubs and similar places during the year. The religious affairs minister stated that 28 such raids had been conducted in Kuala Lumpur between 2002 and January 2005.

On September 14, a Shari'a court sentenced a Muslim man and woman each to a fine of $792 (2,850 ringgit) or seven months in jail for committing khalwat, or "close proximity" (the charge usually used to prosecute premarital or extramarital sexual relations) near Kuala Lumpur in December 2005. The maximum sentence for khalwat is a maximum of two years in jail, a fine $833 (3,000 ringgit), or both.

On October 12 on the island of Langkawi, a married foreign tourist couple was awakened at 2 a.m. by six Muslim religious enforcement officials. The officials suspected the couple of engaging in khalwat and demanded to see their marriage certificate. The couple was Christian and therefore not subject to the jurisdiction of the religious authorities. Following a brief standoff with the religious authorities in their rented condominium, the couple filed a police report. Langkawi tourism officials subsequently issued an apology to the couple.

On June 13, the National Fatwa Committee (the primary advisory body to the National Fatwa Council that guides Muslims on religious matters) announced its resolution that Muslims should not attend traditional "open house" festivals in honor of other religions' holidays. According to news reports, the committee said such gatherings could erode Muslims' faith and lead to blasphemy. The minister of culture, arts, and heritage called the recommendation regrettable, stating that it undermined efforts to improve racial and religious harmony.

Societal Abuses and Discrimination

Relations among religious groups were generally amicable, although the public discourse between Muslims and non Muslims about religious issues became strained during the year (see section 2.a.). In August a leaflet was widely distributed that contained a death threat against a prominent Muslim human rights lawyer who had played a leading role in organizing Article 11 discussions and publicly warned against the encroachment of Shari'a upon the jurisdiction of the civil court system. Political and religious leaders from across the religious spectrum criticized the leaflet. However, several NGO leaders and opposition party politicians noted that government criticism of the death threat was muted; no cabinet level minister publicly condemned it. At year's end police continued their investigation of the death threat.

No reliable estimate of the country's Jewish population was available, and there was no locally based Jewish community or synagogue in the country. There were no reports of anti Semitic acts.

For a more detailed discussion, see the 2006 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The constitution provides for these rights, and the government generally respected them in practice, although there were restrictions in some circumstances. The eastern states of Sabah and Sarawak controlled immigration and required citizens from peninsular Malaysia and foreigners to present passports or national identity cards for entry.

The government regulated the internal movement of provisionally released ISA detainees. The government also used the Restricted Residence Act to limit movements of those suspected of some criminal activities (see section 1.d.).

Citizens must apply for government permission to travel to Israel.

The constitution provides that no citizen may be banished or excluded from the country. However, according to the terms of a 1989 peace agreement, Chin Peng, the former leader of the communist insurgency in the country, continued to live in exile in Thailand and was denied permission to return.

Protection of Refugees

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has not established a system for providing protection to refugees. In practice the government did not provide protection against refoulement, the return of persons to a country where they feared persecution, but the government generally did not deport such individuals recognized as persons of concern by the UNHCR. The government did not grant refugee status or asylum, but it cooperated with the UNHCR and generally did not impede other humanitarian organizations from assisting refugees and asylum seekers.

The government continued to deport some asylum seekers and refugees but allowed certain asylum seekers and persons of concern to remain, pending resettlement to other countries. The government generally did not distinguish between asylum seekers and illegal immigrants, detaining them in the same camps. Detention facilities were overcrowded and lacked medical facilities. Local human rights NGOs alleged that detainees were sometimes abused by prison officials and received inadequate food.

A group of Thai citizens who illegally entered the country in August 2005 remained in an illegal migrant detention center. Due to several births, their number had grown from 131 to 134.

At year's end the UNHCR listed 37,170 persons as refugees, of whom 40 percent were Indonesians from Aceh Province and 58 percent were Burmese citizens. The UNHCR received 9,091 new applications for refugee status during the year, down from 15,166 applications in 2005.

The UNHCR stated that 9,186 persons had active asylum cases pending in the country, of whom 74 percent were Burmese citizens. During the year the UNHCR submitted 3,501 refugee cases to third countries for resettlement consideration, and 1,220 refugees were resettled out of the country.

The UNHCR identified 2,996 persons arrested during the year as asylum seekers, recognized refugees, or individuals granted "temporary protection." The UNHCR facilitated the release of 3,333 individuals from police lockups and immigration detention

camps. Police and immigration officials continued to observe an August 2005 directive not to arrest or detain persons solely for immigration violations if they had been granted UNHCR refugee or asylum seeker status.

The government issued temporary residence permits (IMM 13 documents) to more than 30,000 refugees from Aceh between 2005 and year's end. The permits, which allow recipients to gain lawful employment and access to education and health care, were largely subject to renewal on an annual basis. On August 1, the government began to register approximately 12,000 Rohingya refugees, as the initial step toward provision of IMM 13 documents. However, the government quickly halted the registration process, following charges of corruption against intermediaries who facilitated the registration process. At year's end the government had not resumed the IMM 13 registration process.

While holders of IMM 13 documents were allowed to send their children to private schools, the government refused to allow these children into the public school system on a cost free basis. However, refugee parents who held IMM 13 documents generally lacked sufficient funds to afford private schooling for their children.

To find and detain illegal migrants, the Home Affairs Ministry relied primarily upon a People's Volunteer Corps, known as RELA and consisting of approximately 440,000 citizens, to accompany police and immigration officials on raids. Following repeated media reports of alleged abusive behavior and inappropriate language by RELA members during raids, in February the ministry stated that only a small minority of RELA members would be allowed to participate in operations against illegal migrants and that RELA officers remained prohibited from body searching a suspect.

The immigration law provides for six months in prison and up to six strokes of the cane for immigration violations. In practice, delays in processing travel documents led to the detention of many illegal immigrants in camps for more than a year (see section 1.d.).

In July several NGO leaders reported that conditions in immigrant detention centers had not materially improved, largely due to inadequate funding for food, medical care, and infrastructure maintenance, despite the fact that in 2005 the Prisons Department took over management of the centers from the Immigration Department.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens the right to change their government peacefully, and citizens exercised this right in practice through periodic elections based on universal suffrage; however, while votes generally were recorded accurately, there were irregularities that affected the fairness of elections.

Elections and Political Participation

Opposition parties were unable to compete on equal terms with the governing coalition (which has held power at the national level since independence in 1957) because of significant restrictions on campaigning, freedom of assembly and association, and access to the media. Nevertheless, opposition candidates campaigned actively, with some success in past state and national elections. In the most recent national elections, held in 2004, opposition parties captured 19 of 219 parliamentary seats and 52 of 505 state assembly seats.

The lack of equal access to the media was one of the most serious problems encountered by the opposition in the 2004 national elections (see section 2.a.). Opposition leaders also claimed that the election commission was under government control and did not carry out its duties impartially. There were numerous opposition complaints of irregularities by election officials during the 2004 campaign; however, most observers concluded that they did not substantially alter the results. Allegations were lodged of voter rolls being inflated by illegally registered "phantom" voters reportedly brought in from other districts to vote in tightly contested districts, nonregistered voters using fictitious names or the names of dead voters still listed on the voter rolls, and noncitizens illegally registered to vote. In addition, ballots were marked with a serial number that could be matched against a voter's name. Prior to the Sarawak state assembly election on May 20, the election commission disallowed such ballot marking for all future state and national elections.

On November 18, the election commission announced that it had eliminated the names of more than 180,000 deceased voters from the electoral rolls during the preceding three months. As a result of the commission's ongoing efforts, the election commission chairman estimated that the election rolls for the next general election would contain approximately 9.8 million names, compared with the 10.3 million names registered for the 2004 election.

Following the May election in Sarawak, a local NGO criticized the data quality of Sarawak's elector rolls, commenting that they increased the likelihood of voting fraud. Upon examination of 14 of Sarawak's 71 electoral districts, the NGO reported in August that more than 35 percent of the districts' 230,000 electors had no address listed on the elector rolls. In addition, in some cases more than 50 voters were simultaneously registered to a single address. Despite problems with the elector rolls and very little press coverage from Sarawak's mainstream media sources, controlled by National Front constituent parties, opposition parties increased their representation in the 71 seat state assembly from one seat to eight.

The constitution states that parliamentary constituencies should have approximately equal numbers of eligible voters; however, in

practice the numbers varied significantly. The constitution also states that greater weight should be given to rural constituencies. In 2003, following nationwide redistricting, 25 new parliamentary seats were added, primarily in states in which the ruling coalition was strong. The opposition complained that the two states it controlled prior to the 2004 elections did not receive any new seats and that the redistricting was undertaken to weaken the opposition. Observers agreed that the redistricting favored government candidates for parliamentary seats but believed it had less influence on elections for state seats.

The Malay based UMNO party dominated the ruling National Front coalition. Since 1969 the National Front coalition has maintained at least a two thirds majority in parliament, which enabled the government to amend the constitution at will.

Over the years power increasingly has been concentrated in the prime minister, and parliament's function as a deliberative body has deteriorated. Legislation proposed by the government rarely was amended or rejected, while legislation proposed by the opposition was not given serious consideration. Parliamentary procedures allow the speaker of parliament to suspend members, establish restrictions on tabling questions, edit written copies of members' speeches before delivery, and severely restrict members' opportunities to question and debate government policies. Nonetheless, government officials often faced sharp questioning in parliament, and this was reported in the press in greater detail than in the past.

After the 1969 race riots, the government abolished elected local government in favor of municipal committees and village chiefs appointed by state governments. Under the Local Government Act, elections of public officials were confined to state assemblies and the federal parliament. Some politicians and NGO activists advocated the reintroduction of local government elections. Some ruling party municipal officials noted that local bodies were simply "rubber stamps" for the government.

On July 24, the government refused to register the Malaysian Dayak Congress, a new opposition political party in Sarawak. The registrar of societies provided no public justification for the refusal. On August 16, the court of appeal unanimously upheld a high court ruling that supported the government's decision to withhold nationwide registration for the Socialist Party of Malaysia (PSM), based in Selangor State. The court of appeal did not base its decision on the government's claim that national registration of the party would negatively impact national security. Instead, the three judges stated that the PSM lacked representatives in its leadership committee from the requisite minimum seven states and therefore could not receive formal recognition as a national political party. PSM leaders appealed the case to the Federal Court, where it remained pending at year's end.

Women faced no legal limits on participation in government and politics. At the end of the year, three of 33 cabinet ministers were women. Women held 21 of 219 seats in the lower house and 17 of the 64 senate seats.

Ethnic minorities were well represented in cabinet level positions in government as well as in senior civil service positions. In practice the political dominance of the Malay majority meant that ethnic Malays held the most powerful senior leadership positions. Nonetheless, non Malays filled 10 of the 33 ministerial posts and 21 of 35 deputy minister positions.

Government Corruption and Transparency

There was a broadly held perception of widespread corruption and cronyism within the governing coalition and in government institutions. As of November the Anti Corruption Agency (ACA) employed approximately 1,800 staff members nationwide. According to the ACA director general, the agency initiated the arrest of 339 individuals during the first nine months of the year, resulting in 205 prosecutions. During the same period the ACA reviewed 8,614 corruption allegations against public officials; most were not pursued due to lack of evidence. The ACA stated that more than 90,000 citizens participated in the agency's anticorruption talks, exhibitions, and seminars during the year.

In May the ACA launched an investigation into an UMNO member of parliament accused of attempting to circumvent customs duties on imported logs. The government formed a four person panel, headed by the deputy prime minister and other National Front politicians, to investigate the matter. The panel had not completed its investigation by year's end.

On December 7, a high court judge agreed to hear the appeal and stay the sentence of a former municipal council president who was convicted on four corruption charges, including solicitation of bribes from a property developer. On November 29, he was sentenced to four years in jail and fined $113,000 (405,000 ringgit).

There was no law designed to facilitate citizens' requests for government statistics or other information collected and compiled by the government. Individual members of parliament were allowed to request and obtain such information on an ad hoc basis, some of which was then made available to the public.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were somewhat cooperative and responsive to their views. However, under Prime Minister Abdullah there generally was a more cooperative atmosphere toward human rights NGOs.

The government generally did not encourage international human rights organizations to form domestic branches; however, it

usually did not restrict access by representatives of those organizations.

Suhakam was generally considered a credible monitor of the human rights situation and a check on police activities. Suhakam is not empowered to inquire into allegations relating to ongoing court cases and must cease its inquiry if an allegation under investigation becomes the subject matter of a court case. In its most recent annual human rights report, published in May, Suhakam focused on the rights of women and children, older persons, and persons with disabilities; land rights for native tribes; and Suhakam's provision of human rights awareness training for teachers and their pupils. In addition, the report criticized prison conditions, deaths in police custody, detentions without trial, lengthy delays in the disposal of court cases, and some government imposed restrictions on freedom of assembly. The report recommended enactment of freedom of information legislation, requested a review of the ISA, and recommended legislative amendments to uphold the right to peaceful assembly.

Suhakam commissioners traveled throughout the country to educate community leaders, including police officials, on the importance of human rights. Commissioners also made several visits to prisons throughout the country to monitor conditions. They repeatedly noted that a major unresolved challenge was the slow government response to their reports on major topics that touched on fundamental liberties.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The constitution provides for equal protection under the law and prohibits discrimination against citizens based on sex, religion, race, descent, or place of birth. However, the constitution also provides for the "special position" of ethnic Malays and the indigenous peoples of the eastern states of Sabah and Sarawak (collectively, bumiputras), and discrimination based on this provision persisted. Government policies and legislation gave preferences to bumiputras in housing, home ownership, awarding of government contracts and jobs, educational scholarships, and other areas. Nonbumiputras regularly complained about these preferences, arguing that government subsidies for disadvantaged persons should be dispensed without regard to race.

Women

Violence against women remained a problem. Reports of rape and spousal abuse drew considerable government, NGO, and press attention. The Domestic Violence Act of 1994 addresses violence against women in the home. Under the act, anyone who willfully contravenes a protection order by using violence against a protected person may be punished by imprisonment of up to one year and a maximum fine of $556 (2,000 ringgit); however, violators were commonly punished under the penal code, which carries the same penalty. In extreme cases involving "grievous hurt" inflicted using a deadly weapon, the maximum imprisonment increases to 20 years. Women's groups criticized the act as inadequate and called for amendments to strengthen it. In their view, the act fails to protect women in immediate danger because it requires separate reports of abuse to be filed with both the Social Welfare Department and the police, causing delay in the issuance of a restraining order against the perpetrator. Women's rights activists also highlighted the fact that the act's incorporation into the penal code limits legal protection for victims to cases in which visible evidence of physical injury is present, despite its interpretation to include sexual and psychological abuse. As in 2005, NGOs working on women's rights claimed that police enforcement continued to be lax.

Although the government, NGOs, and political parties maintained shelters and offered other assistance to battered spouses, activists asserted that support mechanisms for victims of domestic violence remained inadequate. There was a sexual investigations unit at each police headquarters to help victims of sexual crimes and abuse. Police responses and sensitivity to complaints of domestic violence continued to improve, but women's rights activists claimed that police needed additional training in handling domestic abuse and rape cases.

The 2005 police commission report noted that police abuses of women's rights were largely the result of a lack of adherence to existing laws and the police code of conduct. In response, police in Kuala Lumpur assigned female officers in each police district to work exclusively on domestic violence cases and provide basic counseling to victims.

Some Shari'a experts urged Muslim women to become more aware of the provisions of Shari'a that prohibit spousal abuse and provide for divorce on grounds of physical cruelty. Provisions in state Shari'a laws, however, generally prohibit wives from disobeying the "lawful orders" of their husbands and present an obstacle to women pursuing claims against their husbands in Shari'a courts. Muslim women were able to file complaints in civil courts.

Spousal rape is not a crime. CPC and penal code amendments approved by parliament in July do not define marital rape, although a husband may be charged for causing hurt to his wife while attempting to force sexual relations with her. By year's end the government had not amended the penal code to explicitly include spousal rape as an offense, despite recommendations in 2004 from Suhakam and local NGOs.

Another amendment approved in July stipulates that the courts may decide the minimum jail term for a man convicted of statutory rape of a girl age 15 years or less. Prior to the amendment, the penal code had stipulated minimum jail sentences for such behavior. In addition, an amendment prohibits a person in authority from using his position to intimidate a subordinate into having sexual relations.

According to the police, 2,012 rapes were reported during the first 10 months of the year, compared with 1,931 in all of 2005. Over

the same time periods, domestic violence incidents reported to police totaled 2,699 and 3,093, respectively. Many government hospitals had crisis centers where victims of rape and domestic abuse could make reports without going to a police station. NGOs and political parties also cooperated in providing counseling for rape victims, but cultural attitudes and a perceived lack of sympathy from the largely male police force resulted in many victims not reporting rapes. According to the Ministry of Women, Family, and Community Development (MWFCD) and a leading women's NGO, only 10 percent of rape cases were reported to police. The penal code states that rape is punishable by a prison term of up to 30 years, caning, and a fine. On September 3, a sessions court sentenced a child rapist to 62 years in prison and five cane strokes for raping six children ages nine to 14 during eight days in July. Women's groups noted that while other rapists also received heavy punishments, including caning, some rapists received inadequate punishments.

Prostitution by citizens is not a criminal offense, although Muslims engaged in prostitution could face civil penalties under Shari'a for engaging in sexual relations out of wedlock. Foreign prostitutes were routinely arrested for violating the terms of their nonimmigrant visas. Pimping, or financially benefiting from the prostitution activities of others, is illegal and was prosecuted. During the first 10 months of the year, police arrested 4,727 foreigners suspected of involvement in prostitution, compared with 6,484 such persons arrested during all of 2005. Chinese nationals accounted for the largest percentage of these arrests (42 percent), followed by Indonesians (23 percent), Thais (18 percent), and Filipinas (10 percent). Police were accused of profiling female Chinese nationals as potential prostitutes, following several highly publicized arrests (see section 1.c.). In March a police spokesman stated that an estimated 142,000 women were involved in prostitution.

The country was a destination, transit, and, to a lesser extent, source country for trafficking in women for purposes of prostitution and domestic servitude (see section 5, Trafficking).

A government code of conduct provides a detailed definition of sexual harassment and attempts to raise public awareness of the problem, but women's groups advocated passage of a separate law on sexual harassment in lieu of the voluntary code. The Malaysian Employers Federation opposed any attempt to legislate against sexual harassment in the workplace, arguing that government imposed policies would unduly restrict the management of labor relations. Amendments to the Employment Act passed in March require employers to act within two weeks to address complaints of sexual harassment filed by a worker.

Polygyny is allowed and practiced to a limited degree. Islamic inheritance law generally favors male offspring and relatives. There was a small but steadily increasing number of women obtaining divorces under the provisions of Shari'a that allow for divorce without the husband's consent.

Women's rights advocates asserted that women faced discriminatory treatment in Islamic courts due to prejudicial interpretation of Islamic family law and the lack of uniformity in the implementation of such laws among the various states. In addition, the country had no female Shari'a court judges. In December 2005 parliament passed amendments to the Islamic Family Law Act to harmonize Shari'a throughout the country. Following sustained public pressure by women's rights leaders early in the year, the prime minister ordered a review of the amendments before they were gazetted into law; the review continued at year's end.

Non Muslim women are subject to civil law. The Guardianship of Women and Infants Act gives mothers equal parental rights. Four states extend the provisions of the act to Muslim mothers, and women's groups urged the other states to do the same.

The government undertook a number of initiatives to promote equality for women and the full and equal participation of women in education and the work force. In January the state of Johor appointed the first woman to head a state's civil service. In another unprecedented move, in April women were selected to lead two of the country's 17 public universities. In 2005 women comprised 63.4 percent of all university students and more than half of all university graduates in the scientific and medical fields. According to the National Union of Bank Employees, 65 percent of its members were women, but only one of eight principal banking officials was a woman. Women comprised approximately 10 percent of board members at publicly traded companies during each year from 2000 to 2005. At the end of 2005, women accounted for a significant portion of the country's lawyers (45 percent), accountants (43 percent), and medical doctors (37 percent).

Children

The government has demonstrated a commitment to children's rights and welfare and allocated approximately 25 percent of the national budget to education. The government provides free education for children through age 15. Although primary education is compulsory, there is no enforcement mechanism governing school attendance. Attendance at primary school was 96 percent, while secondary school attendance was 82 percent. There was no difference in the treatment of girls and boys at the primary and secondary levels. A variety of programs provided low cost health care for most children.

The law prescribes severe punishments for child trafficking, abuse, molestation, neglect, and abandonment. The law allows that a maximum of 10 strokes with a "light cane" be applied to male children between ages 10 to 18.

The government recognized that sexual exploitation of children and incest were problems. Incest in particular was a problem in rural areas. The law provides for six to 20 years' imprisonment and caning for individuals convicted of incest. The police stated that 295 cases of incest were reported in 2005, down from 334 cases in 2004. In past years the majority of incest cases involved children under 15 years of age. The testimony of children is accepted only if there is corroborating evidence. This posed special problems

for molestation cases in which the child victim was the only witness.

Statutory rape occurred and was prosecuted. However, Islamic law provisions that consider a Muslim girl an adult after her first menstruation sometimes complicated prosecution of statutory rape. Such a girl may be charged with khalwat, even if she is under the age of 18 and her partner is an adult. Thus Shari'a courts sometimes punished the victims of statutory rape. Although Shari'a courts sometimes were more lenient with males charged with khalwat, in many cases Muslim men were charged and punished for statutory rape under civil law.

Child prostitution existed, but child prostitutes often were treated as delinquents rather than victims (see section 5, Trafficking).

Child labor occurred in certain areas of the country (see section 6.d.).

Sabah State had a problem of street children. Estimated to number anywhere from a few score to a few hundred, they were born in the country to illegal immigrant parents who had been deported. These children lacked citizenship and access to government provided support.

Trafficking in Persons

There is no law that specifically and comprehensively criminalizes trafficking in persons. However, the Child Act prohibits all forms of trafficking of children under 18, and the penal code addresses procurement of women for the purpose of prostitution. The government also uses other laws, such as the Immigration Act, the Restricted Residence Act, and the ISA, to arrest, prosecute, and detain traffickers.

The country was a destination, and to a lesser extent, a source and transit point for men and women trafficked for the purposes of sexual exploitation and forced labor. Foreign trafficking victims, mostly women and girls from the People's Republic of China, Indonesia, Cambodia, Thailand, the Philippines, and Vietnam, were trafficked to the country for commercial sexual exploitation. These women often worked as karaoke hostesses, "guest relations officers," and masseuses. Some Malaysian women, primarily of Chinese ethnicity, were trafficked abroad for sexual exploitation. Some economic migrants working as domestic servants or laborers in the construction and agricultural sectors faced exploitative conditions that met the definition of involuntary servitude (see section 6.e.).

According to police, the Bar Council, and Suhakam, many foreigners found to be involved in prostitution were possible trafficking victims. Foreign embassies, NGOs, and government authorities reported that at least 300 to 400 trafficking victims were rescued and repatriated in each of the past two years, although the rescues did not lead to a significant number of arrests and prosecutions of traffickers. There were allegations of corruption among law enforcement personnel, since some trafficking victims were known to pass through two or more ports of entry without travel documents.

A small number of Malaysian women and girls were trafficked for sexual purposes, mostly to Singapore, Macau, Hong Kong, and Taiwan, but also to Japan, Australia, Canada, and the United States. According to police and ethnic Chinese community leaders, female citizens who were victims of trafficking were usually ethnic Chinese, although ethnic Malay, ethnic Chinese, and ethnic Indian women also worked as prostitutes domestically. Police and NGOs believed that criminal syndicates were behind most of the trafficking. Information from the Ministry of Foreign Affairs and NGOs indicated that fewer than 100 Malaysian women were trafficked to other countries during the year and that the number had declined in recent years.

Foreign trafficking victims were kept compliant through involuntary confinement, confiscation of travel documents, debt bondage, and physical abuse. During the year there were reports of foreign women escaping from apartments where they were held against their will and forced to serve as unwilling prostitutes. According to news reports, these women said that they were lured to the country by promises of legitimate employment but were forced into prostitution upon their arrival in the country.

The penal code includes extensive provisions that prohibit buying or selling any person, using deceitful means to bring anyone into or out of the country, and wrongfully restraining (defined to include using threats, withholding clothing, or holding a person's passport) any person with the intention to use that person for prostitution. Punishment for these offenses includes a maximum 15 year prison term, caning, and a fine, to be determined at the discretion of the sentencing judge. During the first 10 months of the year, police arrested 22 individuals under sections of the penal code that criminalize procuring and brothel operations, compared with 34 such arrests during all of 2005. During the first 10 months of the year, police arrested 16 individuals under the Restricted Residence Act for allegedly arranging prostitution activities, compared with 64 such arrests during 2005. In addition, six individuals were detained under the Emergency Ordinance for vice activities during the first 10 months of the year, compared with two such detentions during 2005. In September the IGP stated that police had arrested 143 pimps since June 2003 and detained 126 persons under the RRA, plus 18 under the Emergency Ordinance.

In March, based on information supplied by Thai NGOs, police in Kuala Lumpur conducted raids in Johor and rescued two Thai trafficking victims under age 18 and three adult Thai victims.

The government assisted some underage prostitutes and rescued some trafficked women and girls. During the year police

implemented a referral system to place foreign trafficking victims in shelters operated by NGOs and certain foreign embassies. However, shelter space in private shelters remained inadequate to hold all identified victims, and those whom shelters could not accept were transferred to immigration detention facilities for deportation processing. At year's end the government had not implemented training programs that would enable systematic screening and identification of trafficking victims from among the illegal migrants processed by police and immigration authorities. In September the IGP publicly called for the government to enact comprehensive antitrafficking legislation and stressed the need for the law to include provisions for victim protection, shelters, repatriation, and prevention of retrafficking.

A number of foreign embassies arranged temporary shelter for their respective trafficking victims and assisted in their repatriation. The Indonesian embassy compound in Kuala Lumpur contained a separate shelter facility that typically held more than 150 female victims of employer abuse and of sexual and labor trafficking. The Indonesian embassy assisted up to 800 victims during the year.

The MWFCD, as well as senior immigration and police officials, stated that a comprehensive antitrafficking law was needed to treat trafficked women as victims rather than as illegal immigrants. The ministry stated that, lacking such legislation, it could not legally establish a shelter for trafficked women.

Persons with Disabilities

Neither the constitution nor other laws explicitly prohibit discrimination based on physical or mental disabilities, but the government promoted public acceptance and integration of persons with disabilities.

The government did not discriminate against persons with disabilities in employment, education, or in the provision of other state services. A public sector regulation reserves 1 percent of all public sector jobs for persons with disabilities. The government did not mandate accessibility to transportation for persons with disabilities, and few older public facilities were adapted for such persons. New government buildings were generally outfitted with a full range of facilities for persons with disabilities. The budget for the fiscal year included additional tax benefits for persons with disabilities and their spouses.

A code of practice serves as a guideline for all government agencies, employers, employee associations, employees, and others to place suitable persons with disabilities in private sector jobs. Suhakam recommended legislation to address discriminatory practices and barriers facing persons with disabilities, and it organized dialogues among persons with disabilities, government departments, and NGOs to promote awareness of the rights of persons with disabilities.

Special education schools existed but were not sufficient to meet the needs of the population with disabilities. The government undertook initiatives to promote public acceptance of persons with disabilities, make public facilities more accessible to such persons, and increase budgetary allotments for programs aimed at aiding them. Recognizing that public transportation was not "disabled friendly," the government maintained its 50 percent reduction of the excise duty on locally made cars and motorcycles adapted for persons with disabilities.

National/Racial/Ethnic Minorities

The law and government policy provide for extensive preferential programs designed to boost the economic position of bumiputras. Such programs limited opportunities for nonbumiputras in higher education, government employment, business permits and licenses, and ownership of land. According to the government, these programs were necessary to ensure ethnic harmony and political stability. Ethnic Indian citizens, who did not receive such privileges, remained among the country's poorest groups.

In August the minister of higher education stated that the nation's 17 public universities employed few nonbumiputra deans. At the University of Malaysia, 19 of 20 deans were bumiputras; in many other universities deans were exclusively bumiputras. They also accounted for more than 85 percent of the country's almost 900,000 civil servants at the end of 2005. The percentage has steadily increased over previous decades. Bumiputras accounted for approximately 95 percent of the almost 410,000 applications for civil service jobs that the government received in 2005.

Indigenous People

Indigenous people (the descendants of the original inhabitants of the peninsular region of the country and the Borneo states) generally enjoyed the same constitutional rights as the rest of the population. However, in practice federal laws pertaining to indigenous people of the peninsular region, known as the Orang Asli, vest considerable authority in the non Orang Asli minister for rural development to protect, control, and otherwise decide issues concerning this group. As a result, indigenous people in peninsular Malaysia had very little ability to participate in decisions that affected them.

The Orang Asli, who numbered approximately 149,500, constituted the poorest group in the country. According to government statistics, approximately 77 percent of Orang Asli households were categorized as living below the poverty level. A government sponsored national advisory council monitored the development of Orang Asli, but only five of the council's 17 members were Orang Asli. In addition, only one Orang Asli held a management position in the government's Department of Orang Asli Affairs. Under its ninth economic plan covering the years 2006 10, the government allocated slightly more than $100 million (361.8 million

ringgit) for development projects for the Orang Asli. These focused on improving health, preschool education, infrastructure, and economic activities. The plan included an additional $28 million (100 million ringgit) for development of lands inhabited by the Orang Asli.

The dropout rate among Orang Asli students remained high. Government statistics as of November indicated that 26,000 Orang Asli pupils were registered at the primary school level, while only 8,700 students were registered in secondary schools. In March the minister of rural and regional development stated that the dropout rate among Orang Asli children was more than 50 percent in secondary schools.

Under the Aboriginal People's Act, the Orang Asli were permitted to live on designated land as tenants at will, but they did not possess land rights. Observers reported that over the years the total area of land reserved for Orang Asli had decreased, and some land previously set aside as Orang Asli reserve had been rezoned for development.

The uncertainty surrounding Orang Asli land ownership made them vulnerable to exploitation. Logging companies continued to encroach on land traditionally held by Orang Asli and other indigenous groups in the Borneo states. Indigenous people in Sabah and Sarawak continued to protest encroachment by state and private logging and plantation companies onto land that they considered theirs under native customary rights. After four Suhakam commissioners visited impoverished natives of the large Penan tribe September 17 19 in Sarawak, they stated that living conditions of the Penan people had not improved during the past five years. The commissioners also found that the vast majority of the Penan people visited were not registered as citizens by the government.

A case regarding ownership of the land used for the construction of the Kuala Lumpur International Airport remained pending at year's end. In September 2005 the court of appeal upheld a high court ruling that the Temuans, an Orang Asli group in peninsular Malaysia, were the rightful owners of the land and ordered the Selangor state government pay compensation; however, the government appealed the decision. On November 21, the Federal Court agreed to hear the appeal initiated by the state of Selangor and the federal government. At year's end no decision had been issued.

Laws allowing condemnation and purchase of land do not require more than perfunctory notifications in newspapers, to which indigenous people may have no access. In past years this led to indigenous people being deprived of their traditional lands with little or no legal recourse. However, during the year there were no reports of such acts.

Other Societal Abuses and Discrimination

Although there are no laws that prohibit homosexuality, laws against sodomy and "carnal intercourse against the order of nature" exist and were enforced. Religious and cultural taboos against homosexuality were widespread. The government's response to HIV/AIDS was generally nondiscriminatory, although stigmatization of AIDS sufferers was common.

Section 6 Worker Rights

a. The Right of Association

By law most workers have the right to engage in trade union activity, but only 9.5 percent of the labor force was represented by trade unions. Those restricted by law from joining a union include public sector workers categorized as "confidential" and "managerial and executive," as well as defense and police officials. With certain limitations, unions may organize workplaces, bargain collectively with employers, and associate with national federations. In theory foreign workers can join a trade union; however, the Immigration Department placed conditions on foreign workers' permits that effectively barred them from joining a trade union (see section 6.e.).

The Trade Unions Act prohibits interfering with, restraining, or coercing a worker in the exercise of the right to form trade unions or participation in lawful trade union activities. However, the act restricts a union to representing workers in a "particular establishment, trade, occupation, or industry or within any similar trades, occupations, or industries." The director general of trade unions may refuse to register a trade union and in some circumstances may also withdraw the registration of an existing trade union based on provisions outlined in the act. When registration is refused, withdrawn, or canceled, a trade union is considered an unlawful association. During the year the director general canceled the registrations of five trade unions. None of the cancellations was challenged in court.

Trade unions from different industries may join in national congresses, but such congresses must register separately as societies under the Societies Act (see section 2.b.).

Malaysian Trade Union Congress (MTUC) officials continued to express frustration about delays in the settlement of union recognition disputes. While the Industrial Relations Act requires that an employer respond to a union's request for recognition within 21 days of application, it was not uncommon for such applications to be refused and unions to go unrecognized for one to four years. At year's end 21 trade union applications were pending approval.

Government policy inhibited the formation of national unions in the electronics sector, the country's largest industry. The government stated that establishment of national unions in the electronics sector would impede foreign direct investment and negatively impact the country's international competitiveness in the sector; government leaders stated that enterprise level unions were more appropriate for the electronics industry. According to MTUC officials, 150,000 electronics workers were unable to organize, and only eight in house unions existed in the electronics industry.

Unions maintained independence from both the government and political parties, but individual union members may belong to political parties. Although by law union officers may not hold principal offices in political parties, individual trade union leaders have served in parliament. Trade unions were free to associate with national labor congresses, which exercised many of the responsibilities of national labor unions, although they cannot bargain on behalf of local unions.

Trade unions were permitted to affiliate with international trade union organizations, such as global union federations and the International Confederation of Free Trade Unions, subject to the approval of the director general of trade unions.

b. The Right to Organize and Bargain Collectively

Workers have the legal right to organize and bargain collectively, and collective bargaining was widespread in those sectors where labor was organized.

There are two national labor organizations. The MTUC is a society of trade unions in both the private and government sectors and is registered under the Societies Act. As such, the MTUC does not have collective bargaining or industrial action rights but provides technical support for affiliated members. The other national organization is the Congress of Unions of Employees in the Public and Civil Service (CUEPACS), a federation of public employee unions registered under the Trade Unions Act.

CUEPACS is an umbrella organization that included 127 distinct civil servant unions with approximately 300,000 members of a total of one million civil servants, represented by an estimated 160 unions. Teacher unions accounted for 140,000 of CUEPACS' 300,000 members. CUEPACS holds talks with the government through three National Joint Councils (NJCs) that represent three types of workers: managerial and professional, science and technology, and general (all other types of workers, such as clerical and support staff). The government established the NJC system to have NJCs serve as aggregating, intermediary negotiating bodies between the government and the various unions served by CUEPACS. NJC members are elected from constituent unions. While an individual civil service union may approach the government directly on narrow issues that affect only that particular union or its members, broader issues that affect the entire civil service flow up to CUEPACS and then to one of the NJCs, depending on the type of civil servants involved.

Government regulations limited CUEPACS' negotiating power and virtually eliminated its right to organize strikes. During the year CUEPACS sought to obtain a minimum wage for civil servants; however, by year's end the government had announced no plans to institute a minimum wage for public or private sector workers.

The government placed limits on collective bargaining agreements in companies designated as having "pioneer status." The MTUC continued to object to legal restrictions on collective bargaining in "pioneer" industries. On September 21, approximately 1,000 factory workers from 200 factories nationwide held a protest outside parliament. They demanded a national minimum wage of $250 (900 ringgit) per month, a national union for electronics workers (prohibited by the government, due to the electronics industry's "pioneer" status), reduced working hours, and an increase in paid maternity leave from 60 to 90 days. At year's end the government had not responded to their demands.

Charges of discrimination against employees engaged in organizing union activities may be filed with the Ministry of Human Resources or the industrial court. Critics alleged that the industrial court was slow in adjudicating worker complaints when conciliation efforts by the Ministry of Human Resources failed. In addition, beginning in 2004 the court introduced voluntary mediation as a means for faster case settlements. During the first eight months of the year, mediation was initiated for 95 industrial court cases, with 27 settlements recorded. During 2005 a total of 186 cases were mediated, resulting in 93 settlements. The industrial court does not enforce its own awards, and unions complained that employers often ignored the court's judgments with impunity.

The government holds that issues of transfer, dismissal, and reinstatement are internal management prerogatives; therefore, they are excluded from collective bargaining, which is not in accordance with International Labor Organization (ILO) standards. The minister of human resources can suspend for up to six months any trade union deemed to be used for purposes prejudicial to or incompatible with security or public order. The government has taken no such action during the past several years.

Although strikes are legal, the right to strike is severely restricted. The law contains a list of "essential services" in which unions must give advance notice of any industrial action. The list includes sectors not normally deemed essential under ILO definitions. MTUC officials said that requirements imposed by the authorities were so stringent that it was almost impossible to strike. According to Ministry of Human Resources statistics, only one minor strike occurred during the first nine months of the year, compared with 10 strikes during 2005. Employees in the public sector do not have the right to collective bargaining.

The Industrial Relations Act requires the parties to notify the Ministry of Human Resources that a dispute exists before any industrial

action may be taken. The ministry's Industrial Relations Department then may become involved actively in conciliation efforts. If conciliation fails to achieve settlement, the minister has the power to refer the dispute to the industrial court. Strikes or lockouts are prohibited while the dispute is before the industrial court. The act prohibits employers from taking retribution against a worker for participating in the lawful activities of a trade union. However, some trade unions questioned the effectiveness of the provisions.

Companies in free trade zones (FTZs) must observe labor standards identical to those in the rest of the country. Many workers in FTZ companies were organized, especially in the textile and electrical products sectors.

c. Prohibition of Forced or Compulsory Labor

The constitution prohibits forced or compulsory labor, and the government generally enforced this prohibition. Certain laws allow imprisonment with compulsory labor as punishment for persons who express views opposed to the established order or who participate in strikes. However, these laws were not applied.

Some of the estimated 320,000 foreign women employed as household workers were subjected to physical abuse and forced to work under harsh conditions. While the Workmen's Compensation Act and the Employment Act provide a minimum standard of protection to workers, in several important respects they do not apply to household employees (see section 6.e.).

The government prohibits forced and compulsory labor by children, and there were no reports that such practices occurred in the formal sector, although some child household employees worked in conditions amounting to forced labor.

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the employment of children younger than age 14 but permits some exceptions, such as light work in a family enterprise, work in public entertainment, work performed for the government in a school or in training institutions, or work as an approved apprentice. In no case may children work more than six hours per day, more than six days per week, or at night.

Child labor occurred in certain areas of the country. There was no reliable estimate of the number of child workers. Most child laborers worked informally in the agricultural sector, helping their parents in the field; however, only adult members of the family received a wage. In urban areas, child labor could be found in family food businesses, night markets, and small scale industries. Government officials did not deny the existence of child labor in family businesses but maintained that foreign workers had largely replaced child labor and that child labor provisions were vigorously enforced. Some children were exploited in the commercial sex industry (see section 5).

Mechanisms for monitoring workplace conditions were inadequate, and the resolution of most abuse cases frequently was left to private, for profit labor agencies that were themselves often guilty of abuses. Bilateral labor agreements with Indonesia do not provide adequate protections for household workers.

e. Acceptable Conditions of Work

There was no minimum wage provision governing all workers, as the government preferred to allow market forces to determine wages. Prevailing market wages generally provided a decent standard of living for citizens, although not for all migrant workers. Wage councils, established by a 1947 act to provide a recommended minimum wage for sectors in which the market wage was determined insufficient, had little impact on wages in any sector. According to MTUC officials, the wage councils had not met for more than 15 years, and their recommended wages have long been obsolete.

Plantation workers generally received production related payments or daily wages. Under a 2003 agreement, plantation workers received a minimum wage of $97 (350 ringgit) per month. Proponents of the agreement said that productivity incentives and bonuses raised the prevailing wage to nearly $194 (700 ringgit).

Under the Employment Act, working hours may not exceed eight hours per day or 48 hours per workweek of six days. Each workweek must include a 24 hour rest period. The act also sets overtime rates and mandates public holidays, annual leave, sick leave, and maternity allowances. The Labor Department of the Ministry of Human Resources is responsible for enforcing the standards, but a shortage of inspectors precluded strict enforcement.

Significant numbers of contract workers, including numerous illegal migrants, worked on plantations and in other sectors. According to statistics from the National Union of Plantation Workers (NUPW), foreign workers made up 50 percent of the plantation work force; however, the true number may have been higher, since illegal immigrants were not counted. Working conditions for these laborers compared poorly with those of direct hire plantation workers, many of whom belonged to the NUPW.

Work related accidents were especially high in the plantation sector. According to the Human Resources Ministry, 14 percent of all reported industrial accidents during 2004 occurred on plantations. On September 12, the deputy prime minister reported that over the past 12 years industrial accidents had declined by 60 percent, to fewer than 44,000 in 2005. He stated that there had been an

average of 14 work related deaths per 100,000 workers over the past several years, adding that the number compared unfavorably with much lower work related death rates in highly developed countries.

As of September 30, almost 1.9 million legal migrant workers worked mainly in manufacturing (33 percent), plantations (23 percent), as maids (18 percent), and in construction (16 percent). According to the Ministry of Human Resources, as of September 30, the legal foreign workers came from Indonesia (64 percent), Nepal (10 percent), India (7 percent), Burma (5 percent), Vietnam (5 percent), Bangladesh (3 percent), Pakistan (1 percent), the Philippines (1 percent), and other countries (4 percent). Among legal foreign workers, Indonesian workers accounted for 92 percent of domestic helpers, 89 percent of plantation workers, and 81 percent of construction workers. The deputy prime minister stated that between 300,000 and 500,000 illegal migrants also worked in the country, but several union leaders and state politicians believed that the number of illegal migrants could exceed one million.

Foreign workers, particularly if they were illegal aliens, generally did not have access to the system of labor adjudication. However, the government investigated complaints of abuses, attempted to inform workers of their rights, encouraged workers to come forward with their complaints, and warned employers to end abuses. Like other employers, labor contractors may be prosecuted for violating the law. According to the results of a survey conducted during the year by the Federation of Malaysian Manufacturers, the average monthly wage of foreign workers engaged in the manufacturing sector was $161 (581 ringgit).

The Workmen's Compensation Act covers both local and foreign workers but provides no protection for foreign household workers. According to the government, foreign household workers are protected under the Employment Act with regard to wages and contract termination. However, these workers are excluded from provisions of the act that would otherwise ensure that they received one rest day per week, an eight hour work day, and a 48 hour work week.

Employers sometimes failed to honor the terms of employment and abused their household workers. Only household workers ages 25 to 45 were allowed into the country, according to Immigration Department officials. They were not allowed to bring family members into the country while employed. The terms of the contract for Indonesian maids, who comprised approximately 92 percent of all foreign household workers, were often vague and open to abuse. The typical contract provided for a monthly salary of $111 (400 ringgit) but did not specify the number of working hours per day. NGOs reported that many Indonesian household workers were required to work 14 to 18 hours a day, seven days a week. The contract for Filipina household workers included more comprehensive protections, but both groups suffered from a lack of education concerning their legal rights. The government of the Philippines doubled the minimum contractual wage rate for the approximately 12,000 Filipina household workers in the country to $400 per month, beginning December 15, which the embassy estimated would reduce the number of Filipina household helpers in the country by at least 60 percent.

In May the government signed a memorandum of understanding (MOU) with Indonesia stipulating that all household workers must sign a contract with their employer. The contract's terms and conditions, including the maid's salary and working hours, are freely negotiable. Under the MOU, an employer is obliged to open a bank account in the maid's name and deposit her salary into the account on a monthly basis. In addition, employers are required to purchase life and disability insurance for their household workers. Maids are allowed to take contract grievances to the labor court. The MOU contains no provisions regarding mandatory leave or overtime payments for maids. At year's end the government had not released the MOU's full text to the public. This led several workers' rights lawyers and NGO leaders to question the government's commitment to enforce the MOU's provisions.

Some workers alleged that their employers subjected them to inhuman living conditions, withheld their salaries, confiscated their travel documents, and physically assaulted them. Workers have the right to take legal action against abusive employers. According to NGOs, the courts generally sided with employees and ruled that employers must pay all back salary and compensate plaintiffs for injuries, but long delays in court proceedings and rulings often precluded aggrieved foreign workers from seeking redress through the court system.

Legal and illegal foreign workers from Indonesia, Nepal, India, Burma, Vietnam, Bangladesh, the Philippines, and other countries constituted approximately 20 percent of the work force. Illegal foreign workers have no legal protection under the law and have no legal recourse in cases of abuse.

The Occupational Safety and Health Act covers all sectors of the economy except the maritime sector and the armed forces. The act established a national Occupational Safety and Health Council, composed of workers, employers, and government representatives, to set policy and coordinate occupational safety and health measures. It requires employers to identify risks and take precautions, including providing safety training to workers, and compels companies that have more than 40 workers to establish joint management employee safety committees. The act requires workers to use safety equipment and cooperate with employers to create a safe, healthy workplace. Employers or employees that violate the act are subject to substantial fines or imprisonment for up to five years, although the MTUC complained that some employers flouted the rules with impunity. There are no specific statutory or regulatory provisions that provide a right for workers to remove themselves from dangerous workplace conditions without arbitrary dismissal.