SCOTT N. SCHOOLS (SC 9990)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

TRACIE L. BROWN (CABN 184339)
JONATHAN D. SCHMIDT (CABN 230646)
Assistant United States Attorneys
    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436–6767
JOHN GIBBS (VABN 40380)
JOANNA BALTES (CABN 205061)
DOJ Trial Attorneys
    950 Pennsylvania Avenue, Suite 2714
    Washington, D.C. 20350
    Telephone: (202) 353-3469
                (202) 307-6326

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. 07CR 00501-01-JF |
| ) | |
| Plaintiff, ) | **GOVERNMENT'S SUPPLEMENTAL** |
| v. ) | **BRIEFING REGARDING THE ISSUE** |
| ) | **OF WHETHER THERE ARE ANY** |
| RAHMAT ABDHIR et al. ) | **RELEASE CONDITIONS THAT WILL** |
| ) | **ASSURE THE SAFETY OF OTHER** |
| ) | **PERSONS AND THE COMMUNITY** |
| Defendants. ) | |
| ) | SAN JOSE VENUE |

**I.**

**INTRODUCTION**

    Plaintiff United States of America files this supplemental briefing regarding the issue of whether there are any conditions or combination of conditions that would reasonably assure the safety of other persons and the community should the Defendant be released on bond. This matter arose after the Government appealed Magistrate Judge Howard R. Lloyd's order granting pre-trial release to defendant Rahmat Abdhir ("defendant" or "Abdhir").

1    This Court issued an Order on September 18, 2007 addressing the issues of risk of flight
2 and dangerousness. The Court concluded that while it agreed that Defendant posed a flight risk,
3 and further agreed with Judge Lloyd that there are conditions of release that could be fashioned
4 to ameliorate that risk, it did not find a $600,000 secured bond to be sufficient, and therefore,
5 "the Court intends to increase the amount of the bond amount should that become necessary."
6 (Order Re: Pretrial Detention, Request for Supplemental Briefing at p. 9, hereafter "Order").
7    The Court also found that Defendant posed a danger to other persons and the community,
8 and that Defendant's willingness to provide material support to terrorist activity "substantially
9 supports pretrial detention unless it can be shown that there are conditions or combinations of
10 conditions of release that would address the specific ways in which the Defendant poses a
11 danger." (Order at p. 9).
12    For the reasons set forth herein, the Government does not see any condition or
13 combination of conditions that would reasonably assure the safety of other persons and the
14 community were Defendant to be released.

**II**

**THERE ARE NO RELEASE CONDITIONS THAT WOULD ADEQUATELY ASSURE THE SAFETY OF OTHER PERSONS AND THE COMMUNITY**

In its September 18, 2007 Order, the Court cited to two cases, *United States v. Goba*, 240 F.Supp.2d 242 (W.D.N.Y. 2003) and *United States v. Tortora*, 922 F.2d 880 (1st Cir. 1990), as instructive. In *Goba* the Court found that the defendants, who had trained at an al-Qaeda terrorist training camp in the spring and summer of 2001, posed a danger to the community, and that no release conditions would be sufficient to eliminate those risks. *Goba* at 256-257. While the Government agrees that this was the correct decision, it is instructive to point out the differences between the defendants in *Goba* and this defendant. Most fundamentally, the defendants in *Goba* had engaged in the very serious business of attending an al-Qaeda terrorist training camp. Yet after this event in mid-2001, they "resumed their regular lives until their arrests on or about September 13, 2002."

In contrast, this Defendant was involved in his criminal activity virtually up until the time he was arrested on August 2, 2007. On June 25, 2007, Defendant attempted to ship a package

using the name of "Salam A. Jabar" to his co-defendant, Zulkifli Abdhir in the Philippines. That package contained, among other things, a rifle scope, two Colt .45 magazines a Marine Corps manual for an M-16 rifle, and five sets of walkie talkie radios. (Indictment, Overt Act 75 and Count 16). Similarly, in July 2007, Defendant received an e-mail from his brother informing him that Zulkifli Abdhir had just taught a course on sniping where he had taught his students how to zero-in properly. In that e-mail, Zulkifli requested a number of items including a pouch for an M-16 magazine. Defendant replied on July 6, 2007. Rather than attempting to distance himself from his brother's clearly violent activities, he replied that he had checked on such a pouch but its pockets were too small to "hold an M mgzn" but that he was sure the gun show would have one. (Indictment Overt Acts 76 and 77). There were significant enough concerns that the walkie talkie radios might be used for Improvised Explosive Devices (IED's) that this entire package was seized by law enforcement so that it would not make it to Zulkifli Abdhir.

Consequently, this Defendant presents a more troubling picture than the defendants in *Goba*. Abdhir clearly used the United States as a base from which to provide material support to a designated global terrorist who was in the process of engaging, and whom Abdhir knew was in the process of engaging, in violence overseas. And unlike the defendants in *Goba* who had aligned themselves with a violent group overseas, this Defendant appears doubly committed because the person with whom he is aligned is his own brother. Over the course of this conspiracy, Defendant has provided his brother with thousands of dollars of support. While this is not an overwhelming amount of money, in the context of overseas terrorism, it is significant because it takes very little money or material to build a very lethal IED.

In *Tortora* the Court also found that the defendant posed a danger to the community, and that no release conditions would be sufficient to eliminate those risks. *Tortora* at 890. One of the most significant factors that the Court cited in its determination that the defendant in *Tortora* represented a danger to others and the community was his "devotion to the Mafia." *Tortora* at 885.

The same concern is present here. Defendant was not providing this material support to just any criminal co-conspirator. He provided it to his *brother*. He did so despite knowing that

3

1  his brother was (and remains) a wanted terrorist overseas (Indictment Paragraphs 5 and 69). He
2  did so despite knowing full well that his brother was involved in bombings overseas (Indictment
3  Paragraphs 33 and 36). And Defendant has supported this terrorist activity over a long period of
4  time in numerous ways; from providing money to specific items that his brother requests. This
5  familial relationship, the fact that his brother remains at-large overseas, and that his brother still
6  needs money and material to operate, make it likely that this Defendant will try to help him. It is
7  difficult to see how any release conditions could possibly change that fact.
8       In its Order the Court requested supplemental briefing on whether there are any
9  conditions of release which could rebut the finding of Defendant's dangerousness. The Court
10 suggested that the "Government could freeze Defendant's bank accounts, restrict Defendant's
11 access to computers, and otherwise prevent Defendant from communicating with his brother in
12 the Philippines." (Order at p. 10). However the Government respectfully submits that none of
13 these conditions would reasonably assure the safety of other persons and the community.
14      The Government has already seized and frozen Defendant's known bank accounts.
15 However this does not insure that the Defendant will not be able to obtain money from other
16 sources unknown to the Government that the Government would not be able to monitor. This is
17 a Defendant who at the time of his arrest had a well-paying job, owned his home, owned rental
18 property in the San Jose area and had several investment accounts. There is also no way to know
19 whether the Defendant has additional covert sources of funding or accounts. In addition, the
20 Defendant could use other methods to transfer money which are outside of the traditional
21 banking system such as hawalas.[1] He could also use cutouts or intermediaries to achieve the
22 same result.
23      With respect to intermediaries, the government reminds the Court that, at the last hearing,
24 defense counsel argued that some of the Jihadist materials found in Defendant's possession
25 during the execution of the search warrant did not belong to Defendant at all, but rather to

---

[1] *See, "Militant Islam in Southeast Asia"* by Zachary Abuza (Lynne Rienner Publishers, Inc. 2003) at p. 21 ("This type of system [hawalas] is common throughout Southeast Asia and used extensively in Malaysia, Singapore and the Philippines").

4

associates. This, of course, adds to the Government's concern. Apparently Defendant is acknowledging, through counsel, that he associates with others who, whether or not they have joined him in providing material support to overseas terrorists, are at least interested enough in violent Jihad to collect reading material on that subject. At the last hearing the government provided the Court with photographs in which the defendant had posed his very young son on a couch next to him with several rifles behind them. In one of the photos the toddler was posed holding a knife, while Defendant sat next to him with a mask over his face. The government would respectfully submit that the photos exemplify Defendant's extremist tendencies of which this Court should be highly concerned.

Of additional concern is that Defendant and his brother have discussed items such as Insignia two-way radios and how inexpensive they are. Indictment Paragraphs 37 and 40). It takes relatively little money, in other words, to cause unspeakable violence, and this Defendant is now very much aware of the methods of sending money and materiel overseas that are no longer safe for him. The indictment is replete with examples of the Defendant's efforts to conceal the materials and money sent to his brother in the Philippines.

Attempting to limit Defendant's access to computers is even more problematic. Defendant is a highly-trained electrical engineer living in Silicon Valley. A number of hard drives and a laptop computer were seized in the search of his residence on August 2, 2007. Yet again, those are only the computers that the Government is aware of. Even if the Court ordered the Defendant to avoid using any computers, there is no guarantee that he would comply. With the ready availability of laptop computers, Blackberries, cyber cafes and even computers in public libraries, it is difficult to envision that the Defendant would not have an easy time finding a computer to use if he were inclined to violate such a bond condition.

As for otherwise preventing the Defendant from communicating with his brother in the Philippines, this would impose a tremendous burden on Pretrial Services and would be difficult to achieve. The Defendant has demonstrated over the last several years a conscious desire to avoid law enforcement. He has used phony names and phony addresses to send material to his brother. He has used other family members overseas as intermediaries to transfer money to him.

And on August 2, 2007, when he was interviewed by two agents who specifically identified themselves as FBI agents, he spent over an hour denying any connection to his brother, claiming instead that his overseas transfers were going to an unspecified charity. Given his continued willingness to take such efforts to avoid law enforcement, Defendant appears very unlikely to conscientiously abide by release conditions that would require him to refrain from communicating with his brother or other intermediaries.

In the words of the *Tortora* Court, "the Bail Reform Act, as we read it, does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consists of heroic measures beyond those which can fairly be said to have been within Congress's contemplation" *Tortora* at 887. The Government, having indicted and arrested Defendant for his involvement in a violent, criminal conspiracy should not now be required to expend considerable resources to ensure that he does not remain a continuing danger to others.

Under the Bail Reform Act this Defendant is presumed to be a danger, and this Court has so found. However if there are any conditions or combinations of conditions that will reasonably assure the safety of other persons and the community, then those conditions alone should serve to rebut the Defendant's dangerousness. Yet the problem with relying upon release conditions in a case such as this to nullify the Defendant's potential dangerousness is that " they have an Achilles' heel: if there is a unifying theme in this intricate set of restrictions, it is that virtually all of them hinge on the defendant's good faith compliance." *Tortora* at 886. This Achilles heel caused the Court in *Tortora* to conclude that electronic monitoring[2] of the defendant, house arrest and monitoring of the defendant's telephone all fell short of ensuring that he would not pose a danger. The Court also found that being allowed to visit doctors or his attorney also posed a "sizeable loophole" which would allow him to circumvent his release conditions by making stops and detours to continue his criminal activity. *Tortora* at 887.

---

[2] The Court in *Goba* similarly found that electronic surveillance of the defendants was insufficient to rebut the finding of dangerousness. *Goba* at 258.

6

Similarly, the Court in *United States v. Gotti*, 776 F.Supp. 666 (E.D.N.Y. 1991), rejected as impractical, that Defendant's proposals to: 1) remain under house arrest except for supervised travel to and from court appearances and visits to his attorney's office; 2) have his movements and those of his visitors monitored through sophisticated electronic surveillance systems; 3) install a pen register recording device on his telephone line and monitor all telephone lines into his home; 4) limit visitors to immediate family or those approved by the Court; and 5) be subject to unannounced inspections by Pretrial Services representatives. *Id.* at 672.  The Court explained that Defendant's proposals would amount to an elaborate replication of a detention facility without the confidence of security such a facility would instill.  Further, Defendant's proposals would have required three eight-hour shifts of law enforcement personnel to monitor the TV screens and three eight-house shifts fo law enforcement personnel to monitor pen registers and telephone taps and constant surveillance of the Defendant during his visits with his attorney.  The Court wisely acknowledged that there was a limit to the amount of Government resources that should be required to be expended to release dangerous defendants pre-trial, when their constitutional rights are not violated by continued pre-trial detention. *Id.*, citing *United States v. Infelise*, 765 F.Supp. 960 (N.D. Ill. 1990).

The same principle holds true in this case.  Defendant used numerous telephone and e-mail accounts to communicate with his brother throughout the conspiracy.  It would not be difficult for Defendant simply to obtain a new telephone or prepaid cellular phone or to set up any number of new e-mail accounts using his home computer or by visiting any number of public facilities to gain internet access.  Any release conditions would necessarily depend upon the Defendant's good faith compliance, as the criminal conduct in which he has engaged over the past several years, by wiring money overseas and sending material to a specially designated global terrorist, as well as by communicating surreptitiously with him,  is so difficult to monitor or detect.

As Chief Judge (now Justice) Breyer observed in his concurring opinion in *Tortora,* it is a difficult thing to fashion conditions that successfully eliminate the potential harm posed by a dangerous defendant.  Accordingly, Justice Breyer noted that the proposed conditions such as

1 wearing an electronic bracelet, a pen register on the defendant's phone and a promise by the
2 defendant not to contact unapproved persons were insufficient to prevent the most serious risks.
3 As to the latter condition he asked, "why could the appellee not communicate with visitors inside
4 the house; why could he not obtain an unauthorized telephone; why could he not communicate at
5 night through a window?" *Tortora* at 895. And while Justice Breyer did suggest that any
6 conditions designed to address a defendant's dangerousness should be reasonably necessary
7 given the particular facts of a case, and reasonably possible to implement, he left for another day
8 a discussion of exactly what such conditions might be.
9   The concerns that the Government maintains with respect to the dangerousness of this
10 Defendant simply cannot be overcome by constant monitoring by Pretrial Services. As the Court
11 in *Gotti* noted, "the wonders of science and sophisticated electronic technology have made
12 mobile and portable telephones commonplace. Communication devices are easily carried in
13 briefcases and even shirt pockets. Pen registers and wiretaps are easily circumvented. Monitoring
14 equipment is easily rendered inoperative or becomes so by mechanical failure." *Id*. at 673.
15   In the instant case, the Government is unable to envision any release conditions that it
16 believes would reasonably assure the safety of other persons and the community should the
17 Defendant be released on bond   As in *Goba*, *Tortora*, and *Gotti*, the Government does not
18 believe that electronic monitoring, house arrest or the monitoring of the Defendant's telephone
19 would suffice. No other conditions come to mind that would be reasonable to implement or that
20 would guarantee the safety of the community.
21 //
22 //
23 //
24 //
25 //
26 //
27 //
28 //

## III.
## CONCLUSION

For the foregoing reasons, the Government respectfully submits that it does not believe that any condition or combination of conditions would reasonably assure the safety of other persons and the community were the Defendant to be released pending trial in this matter.

Dated:      September 25, 2007                    Respectfully submitted,


                                                  SCOTT N. SCHOOLS
                                                  United States Attorney



                                                  _____
                                                  JONATHON SCHMIDT
                                                  TRACIE BROWN
                                                  Assistant U.S. Attorneys
                                                  JOHN GIBBS
                                                  JOANNA BALTES
                                                  DOJ Trial Attorneys

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. 07CR 00501-01-JF |
| Plaintiff, ) | |
| v. ) | **CERTIFICATE OF SERVICE** |
| RAHMAT ABDHIR et al, ) | |
| Defendants. ) | |

IT IS HEREBY CERTIFIED THAT:

 I, Joanna P. Baltes, am a citizen of the United States and I am at least eighteen years of age. My business address is 950 Pennsylvania Avenue, N.W., Suite 2714, Washington, D.C. 20350.

 I am not a party to the above-entitled action. I have caused service of the government's **GOVERNMENT'S SUPPLEMENTAL BRIEFING REGARDING THE ISSUE OF WHETHER THERE ARE ANY RELEASE CONDITIONS THAT WILL ASSURE THE SAFETY OF OTHER PERSONS AND THE COMMUNITY** on the following party by emailing a copy to:

 Nicholas Humy. nicholas_humy@fd.org
 Cynthia Lie: cynthia_lie@fd.org

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 25, 2007.     /s/ Joanna P. Baltes
                                    JOANNA P. BALTES